Brett Schreiber (SBN 239707)
bschreiber@singletonschreiber.com
Meagan Verschueren (SBN 313117)
mverschueren@singletonschreiber.com
Katie Llamas (SBN 303983)
kllamas@singletonschreiber.com
SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Ste. 1025
San Diego, CA 92108
Tel. (619) 771-3473

Attorneys for Plaintiff JANE DOE


# UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, an individual,<br><br>       Plaintiff,<br><br>  v.<br><br>WYNDHAM HOTEL & RESORTS, INC.; THANDI ENTERPRISES, L.L.C.; CAL TEX HOSPITALITY, L.L.C; METRO HOSPITALITY SERVICES, INC.; RED ROOF INNS, INC.; OCEANIC FRESNO, L.P.; VAGABOND INN CORPORATION; BOOTA SINGH CHAHIL, as an individual trustee of CHAHIL FAMILY TRUST; KULDIP KAUR CHAHIL, as an individual trustee of CHAHIL FAMILY TRUST; KANTILAL B. PATEL, as an individual trustee of PATEL K B & I K LIVING TRUST; INDIRABEN K. PATEL, as an individual trustee of PATEL K B & I K LIVING TRUST; MADHUBEN K. PATEL, an individual; JAGRATI D. BHAKTA, an individual; ROGER BHAKTA, an individual; and ROES 1-200, inclusive,<br><br>       Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT FOR DAMAGES AND INJURIES**<br><br>**JURY TRIAL DEMANDED**<br><br>**Damages in excess of $100,000** |

## COMPLAINT

COMES NOW the Plaintiff JANE DOE, by and through the undersigned counsel, and respectfully submits this Complaint for damages and makes the following averments.

## INTRODUCTION

1.      For decades, sex trafficking ventures have openly operated in and out of hotels and motels throughout the United States.

2.      For decades, major hotel brands have made public statements acknowledging the human trafficking problem at hotels, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3.      While major hotel brands are making false public statements to save face, smaller privately owned hotels and motels falsely claim they have no knowledge that human trafficking is occurring at their properties while at the same time they are directly participating in the trafficking, protecting heinous traffickers, and watching and listening to victims being beat, abused and repeatedly raped daily.

4.      Criminals parade their misconduct openly on hotel and motel properties, including but not limited to at Defendants' properties, throughout the United States, whom profit from participating in the venture and providing harbor for the underlying assaults. The hotel and hospitality industry, including but not limited to Defendants, continue to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

5.       Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties as hubs for human trafficking. The hotel industry, including but not limited to Defendants and their properties, has provided the means, environment, and support for the human trafficking industry to become the second largest profitable criminal activity in the United States.[1]

6.       As the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.  For decades, Defendants have known and should have known that people, including but not limited to Plaintiff were being recruited, enticed, harbored, transported to and from, provided, obtained, advertised, maintained, patronized and solicited to engage in commercial sex by use of force, fraud and coercion at their properties and in the rooms rented for that purpose.  Defendants also knew or should have known that people, including but not limited to Plaintiff, were being forced to engage in commercial sex by use of force, fraud and/or coercion at their properties in the rented rooms that Defendants were profiting from.

7.       The Trafficking Victims Protection Reauthorization Act, 18 U.S. Code Section 1595, gives survivors, including Plaintiff, a route to hold those responsible for her trafficking accountable and for civil recourse against perpetrators and those whom "knowingly benefit[], or attempt[] or conspire[] to benefit, financially or by receiving anything of value from participation in a venture which that person **knew or should have known** has engaged in [recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting a person that will be caused to engage in commercial sex by use of force,

---

[1] https://www.mbfpreventioneducation.org/human-trafficking-is-now-the-second-most-profitable-criminal-activity-in-the-united-states/

fraud or coercion; or forcing a person to engage in commercial sex by use of force, fraud or coercion] . . ..”

8.      Jane Doe files this civil lawsuit seeking civil recourse and justice for the harm she suffered as a result of the heinous acts committed against her while she was being sex trafficked and sold for sex at hotels owned, operated, managed, supervised, and/or controlled by Defendants and their agents and employees, whom all knew or should have known about it.

## PARTIES

9.      Jane Doe is a natural person who is currently a resident and citizen of Massachusetts. Jane Doe is a survivor of sex trafficking. From 2010 through 2016 she was harbored, forced and coerced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

   a.  Due to the sensitive, private, and potentially retaliatory nature of these allegations, this Complaint identifies Jane Doe by a pseudonym only. Jane Doe will move the Court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about Jane Doe's true identity in order to protect Jane Doe and Jane Doe's identity.

   b.  Generally, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved may result in retaliation or harm to the Plaintiff.[3] For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

---

[2] Fed. R. Civ. P. 10(a).
[3] See Cases e.g., Doe v. Penzato, 2011 U.S. Dist. LEXIS 51681, *6-9 (N.D. Cal. May 13, 2011); Roe v. St. Louis Univ., 2009 U.S. Dist. LEXIS 27716, *13, (E.D. Mo. Apr. 2, 2009).

c.   In order to maintain her privacy and safety, Jane Doe should not be compelled to disclose her identity. Jane Doe's privacy interest substantially outweighs the customary practice of judicial openness.[4] Jane Doe would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, Jane Doe's life could be put in grave danger should her traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. Jane Doe will agree to reveal her identity to Defendants for the limited purpose of investigating Jane Doe's claims once the parties have entered into a protective order.

10.    Defendant Wyndham Hotel & Resorts, Inc. ("Wyndham") is a corporation that brands, instructs, advertises for, controls, and contracts with about 9,000 branded properties for profit, including Days Inn by Wyndham® and specifically with Thandi Enterprises, LLC; Cal Tex Hospitality LLC; and/or Metro Hospitality Services, Inc. for the Days Inn by Wyndham Fresno South, located at or near 2640 2nd Street, Fresno, California 93706 ("the subject Days Inn") where Plaintiff was trafficked for years.  It is a Delaware corporation with its principal place of business in Parsippany, State of New Jersey and can be served through its registered agent in Wilmington, Delaware.

11.    Wyndham is the successor to Wyndham Worldwide Corporation and is liable under successor liability for the wrongful acts of Wyndham Worldwide Corp., so "Wyndham," as referred to herein, also includes Wyndham Worldwide Corp.

---

[4] See Cases *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal citation and quotations omitted).

12.     Wyndham shares, and at all relevant times shared, profits with franchisees and directly profited from the room rentals and goods sold for sex trafficking at its branded properties, including the subject Days Inn.  It has known for decades that sex trafficking was occurring at its properties and branded properties, including in California, at Days Inn properties, and at the subject Days Inn.  Wyndham did not and has not taken any reasonable action to prevent sex trafficking at its branded properties, including the subject Days Inn, up to 2016 and beyond.

13.     Wyndham owned and/or had an ownership interest in, supervised, managed, controlled, inspected, operated, handled reports consistent with trafficking, and assumed the responsibility to handle trafficking matters at the subject Days Inn located at or about 2640 2nd Street in Fresno California where Plaintiff was trafficked from approximately 2010 to 2016.

14.     Defendant Thandi Enterprises, LLC is a for-profit California limited liability company with its principal place of business in Fresno, California. Defendant Thandi Enterprises, LLC owned, managed and operated the subject Days Inn by Wyndham Fresno South located at 2640 2nd Street, Fresno, California 93706 during the time Plaintiff was trafficked from approximately 2010 to 2016.

15.     Defendant Cal Tex Hospitality, LLC is a for-profit California limited liability company with its principal place of business in Bakersfield, California. Defendant Cal Tex Hospitality, LLC owned, managed and operated the subject Days Inn by Wyndham Fresno South located at 2640 2nd Street, Fresno, California 93706 during the time Plaintiff was trafficked from approximately 2010 to 2016.

16.     Defendant Metro Hospitality Services, Inc. is a for-profit corporation with its principal place of business in Fresno, California. Defendant Metro Hospitality Services, Inc. owned, managed and operated the subject Days Inn by

Wyndham Fresno South located at 2640 2nd Street, Fresno, California 93706 during the time Plaintiff was trafficked from approximately 2010 to 2016.

17.    Defendant Red Roof Inns, Inc. is a for-profit corporation with its principal place of business in New Albany, Ohio.  It is registered to do business in California and can be served through its registered agent in California. Defendant Red Roof Inn, Inc. owned or had an ownership interest in, operated, supervised, controlled, inspected, branded and advertised, and assumed the responsibility to handle all reports related to, and to deter and prevent, sex trafficking and dictated the response to sex trafficking at the Red Roof Inn located at or near 4141 N. Blackstone Avenue in Fresno, California from approximately 2013 to 2016 when Plaintiff was trafficked for sex regularly at that location.

18.    Defendant Oceanic Fresno, L.P. is a for-profit partnership with its principal place of business in San Diego, California.  Defendant Oceanic Fresno, L.P. owned, operated, and managed the Red Roof Inn located at or near 4141 N. Blackstone Avenue in Fresno, California from approximately 2013 to 2016 when Plaintiff was trafficked for sex regularly at that location.

19.    Defendant Vagabond Inn Corporation is a for-profit corporation with its principal place of business in El Segundo, California.  Defendant Vagabond Inn Corporation had an ownership interest in, operated, controlled, supervised, advertised, and branded the subject Vagabond Inn Fresno located at or about 2570 S. East Avenue in Fresno, California during the time Plaintiff was trafficked there from 2010 to 2016.

20.    Defendant Boota Singh Chahil is an individual resident of the County of Fresno, State of California.  Boota Singh Chahil was the trustee of the Chahil Family Trust from approximately 2009 to 2020.  For the entire time that Plaintiff was trafficked for sex from 2010 to 2016, the Chahil Family Trust, by and through Boota Singh Chahil, owned, managed, operated and controlled the Vagabond Inn

Fresno located at 2570 S. East Avenue in Fresno, California 93706 where Plaintiff was regularly beat, abused, harbored, trafficked and forced to engage in commercial sex.

21.      Defendant Kuldip Kaur Chahil is an individual resident of the County of Fresno, State of California.  Kuldip Kaur Chahil was the trustee of the Chahil Family Trust from approximately 2009 to 2020.  For the entire time that Plaintiff was trafficked for sex from 2010 to 2016, the Chahil Family Trust, by and through Kuldip Kaur Chahil, owned, managed, operated and controlled the Vagabond Inn Fresno located at 2570 S. East Avenue in Fresno, California 93706 where Plaintiff was regularly beat, abused, harbored, trafficked and forced to engage in commercial sex.

22.      Defendant Kantilal B. Patel is an individual resident of the County of Fresno, State of California.  Kantilal B. Patel was the trustee of the Patel K B & I K Living Trust from approximately 2010 to 2012 while Plaintiff was trafficked for sex at the Kings Canyon Motel that was owned and controlled by the Patel K B & I K Living Trust in those years.  From 2010 to 2012, the Patel K B & I K Living Trust, by and through Kantilal B. Patel, owned, managed, operated and controlled the Kings Canyon Motel located at 4770 Cesar Chavez Boulevard in Fresno, California 93702 where Plaintiff was regularly beat, abused, harbored, trafficked and forced to engage in commercial sex.

23.      Defendant Indiraben K. Patel is an individual resident of the County of Fresno, State of California.  Indiraben K. Patel was the trustee of the Patel K B & I K Living Trust from approximately 2010 to 2012 while Plaintiff was trafficked for sex at the Kings Canyon Motel that was owned and controlled by the Patel K B & I K Living Trust in those years.  From 2010 to 2012, the Patel K B & I K Living Trust, by and through Indiraben K. Patel, owned, managed, operated and controlled the Kings Canyon Motel located at 4770 Cesar Chavez Boulevard in Fresno,

California 93702 where Plaintiff was regularly beat, abused, harbored, trafficked and forced to engage in commercial sex.

24.     Defendant Madhuben Kantilal Patel is an individual resident of Fresno County, California. Defendant Madhuben Kantilal Patel has owned, operated, and managed the Kings Canyon Inn (dba Kings Inn) located at or near 4770 Cesar Chavez Blvd. in Fresno, California from approximately 2012 to the present and from 2012 to 2016 when Plaintiff was trafficked for sex regularly at that location.

25.     Defendant Jagrati D. Bhakta is an individual resident of Fresno County, California. Defendant Jagrati D. Bhakta has owned, operated, and managed the Palace Inn located at or near 797 N. Parkway Drive in Fresno, California from approximately 2003 to the present and from 2010 to 2016 when Plaintiff was trafficked for sex regularly at that location.

26.     Defendant Roger Bhakta is an individual resident of Fresno County, California. Defendant Roger Bhakta has owned, operated, and managed the Palace Inn located at or near 797 N. Parkway Drive in Fresno, California from approximately 2003 to the present and from 2010 to 2016 when Plaintiff was trafficked for sex regularly at that location.

27.     Defendants, Thandi Enterprises LLC, Cal Tex Hospitality LLC, and Metro Hospitality Services, Inc. will be referred to collectively as "Days Inn Owners."

28.     Defendants, Boota Singh Chahil and Kuldip Kaur Chahil, trustees of the Chahil Family Trust, will be referred to collectively as "Vagabond Inn Defendants."

29.     Defendants Kantilal B. Patel, Indiraben K. Patel and Madhuben Kantilal Patel, trustees of the Patel K B & I K Living Trust, will be collectively referred to as "Kings Canyon Motel Defendants."

30.     Defendants Jagrati D. Bhakta and Roger Bhakta will be collectively referred to as "Palace Inn Defendants."

31.     As an integrated enterprise and/or joint employer, Wyndham and the Days Inn Owners Defendants are separately and jointly responsible for compliance with all applicable laws.

32.     As an integrated enterprise and/or joint employer, Vagabond Inn Corporation and the Vagabond Inn Defendants are separately and jointly responsible for compliance with all applicable laws.

33.     As an integrated enterprise and/or joint employer, Red Roof Inns, Inc. and Oceanic Fresno, L.P. are separately and jointly responsible for compliance with all applicable laws.

34.     As an integrated enterprise and/or joint employer, Vagabond Inn Defendants and Vagabond Inn Corporation are jointly and severally liable for any damages caused by employees.

35.     As an integrated enterprise and/or joint employer, Wyndham and the Days Inn Owners Defendants are jointly and severally liable for any damages caused by employees.

36.     As an integrated enterprise and/or joint employer, Red Roof Inns, Inc. and the Oceanic Fresno, L.P. Defendants are jointly and severally liable for any damages caused by employees.

37.     As hotel operators, Vagabond Inn Corporation, Red Roof Inns, Inc., and Wyndham control the training and policies for its branded properties including the subject hotels where Plaintiff JANE DOE was trafficked as alleged herein.

38.     Red Roof Inns, Inc. and Wyndham represent that it considers guest safety and security important and requires the hotels in its portfolio, which includes the subject Red Roof Inn and Days inn, to comply with the applicable brand standards and all local, state, and federal laws.

39.     Wyndham represents that its "Board of Directors, management team and subject matter experts throughout the Company are actively engaged in the execution of Wyndham's" social strategy, protecting human rights against trafficking, and its policies and procedures regarding the same. Wyndam publicly represents that "[t]hroughout the year, Wyndham actively engages with team members, [and] . . . franchisees . . .." Wyndham conducts regular inspections and gets regular reports about the operations and issues at each of its branded properties, including at all relevant times the Days Inn where Plaintiff was trafficked.  Based upon information and belief, Wyndham, Vagabond Inn Corporation and Red Roof Inns, Inc. can and does fine, end a contract, and take other remedial actions if its franchisees do not comply with the standards and rules it sets.

40.     Vagabond Inn Corporation, Red Roof Inns, Inc., and Wyndham exercise control over its franchisees.

41.      At all times relevant in this action, Red Roof Inns, Inc. set up, designed, had an ownership interest in, supervised, controlled and/or operated the Red Roof Inn® location at 4141 N. Blackstone Avenue, Fresno, California.

42.     At all relevant times, Wyndham set up, designed, had an ownership interest in, supervised, managed, controlled, and/or operated the Days Inn that was located at 2640 2nd Street in Fresno, California.

43.     At all relevant times, Vagabond Inn Corporation set up, designed, had an ownership interest in, supervised, managed, controlled, and/or operated the Vagabond Inn located at 2570 S. East Avenue in Fresno, California.

44.     Whenever reference is made in this Complaint to any act, deed, or conduct of Vagabond Inn Defendants, the allegation is that Vagabond Inn Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged

in the management, direction, control, or transaction of the ordinary business and affairs of Vagabond Inn Defendants and Vagabond Inn Corporation.

45.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Days Inn Owners, the allegation is that the Days Inn Owners Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Days Inn Owners Defendants and Wyndham Defendant.

46.    Whenever reference is made in this Complaint to any act, deed, or conduct of Oceanic Fresno, L.P. or employees of the subject Red Roof Inn, the allegation is that the Oceanic Fresno, L.P. and Red Roof Inn employees engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Oceanic Fresno, L.P. and Red Roof Inn Defendants and Red Roof Inns, Inc. Defendant.

47.    Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham and the Days Inn Owners defendants.

## JURSIDCTION AND VENUE

48.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA").

49.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and wrongful omissions, led to injuries that occurred in the judicial district where this action is brought.

50.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of Fresno County, California.  Indeed, several Defendants are residents of Fresno County, California and at all times relevant, Defendants were doing business in Fresno County, California.

## SEX TRAFFICKING UNDER FEDERAL LAW

51.     Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[5]

52.     The requirements for liability under the TVPRA under a beneficiary theory can be stated as follows: (1) the person or entity "knowingly benefits, financially or by receiving anything of value" (2) "from participating in a venture" (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).  Sex trafficking is a violation of the Chapter.

53.     "Sex trafficking" is defined by the TVPRA under 22 U.S.C. § 7102(12) as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

54.     The term "severe forms of trafficking in persons" includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or

---

[5] 18 U.S.C. §1591; 22 U.S.C. § 7102.

in which the person induced to perform such act has not attained 18 years of age."
22 U.S.C. § 7102(11).

## FACTUAL ALLEGATIONS

## The Hotel Industry Has Played a Significant Role in the Sex Trafficking Industry for Decades.

55.     Human trafficking, including sex trafficking, has been prevalent at hotels and motels for decades.  Hotel and motel owners, operators and controllers have known about it for decades. Traffickers have used hotels and motels to sell their victims for decades because numerous hotels and motels have knowingly allowed it to happen and failed to report or stop it so that the hotels and motels could continue to regularly profit from the room rentals.

56.     For decades, numerous hotel and motel owners, operators and controllers have accommodated traffickers by accepting cash payments nightly from traffickers for extended stays; giving them two rooms next to each other so that one can be used by buyers to have their way with victims each night; giving rooms away from other guests; warning traffickers about police activity and stings; calling traffickers to come back when police have left the properties; lying to the police and public about trafficking that occurs at their properties; not reporting criminal activity and the trafficking that they observe; and participating as buyers by paying for sex with victims and/or giving traffickers rooms in exchange for sex with victims.

57.     In 2017, human trafficking was noted as the world's fastest growing crime.[6] While the term "human trafficking" incorporates all forced labor, the sex

---

[6] Human Trafficking is the World's Fastest Growing Crime. May 22, 2017. The Advisory Board. Available at:
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking

trafficking industry alone earns an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[7]

58.      The hospitality industry plays a crucial role in the sex trade.[8] Hotels have long profited from their reputations as havens of privacy and discretion for the offenders. Despite the known risks and known trafficking crimes, hotels, including the Defendants, have offered and continue to offer anonymity and non-traceability to the traffickers, making them ideal venues for crime and sex trafficking in particular.  Hotels, including the Defendants, knowingly harbor traffickers, including sellers and buyers, and victims.

59.      Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] For years, sex traffickers have "been able to reap their profits with little risk when attempting to operate within hotels."[10]

60.      According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

---

[7] Profits and Poverty: The Economics of Forced Labor. May 24, 2014. International Labor Organization. Available
at: http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.
[8] Cavagnaro, Giovanna L. C. 2017. Sex Trafficking: The Hospitality Industry's Role and Responsibility. Cornell
University School of Hotel Administration. Available at:
http://scholarship.sha.cornell.edu/honorstheses/3.
[9] This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune (April 2019),
https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.
[10] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016),
https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

61.     In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.  Hotels have been found to account for over 90% of commercial exploitation of children.

62.     Due to the overall hospitality industry's participation, complacency, complicity, negligence, intentional wrongful acts and reckless disregard related to sex trafficking, hotels are the venue of choice for sex trafficking.  Traffickers and buyers capitalize on the hotel industry's general refusal to (1) adopt and enforce companywide anti-trafficking policies from the corporate to the property level, (2) train staff on what to look for and how to respond, and/or (3) establish safe and secure reporting mechanisms for those at the point of sale.

63.     Every day, thousands of hotel employees witness signs of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur—which is on their property and in their view.

64.     Hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation and should be held accountable when they fail to do so and negligently or knowingly choose to participate in the sex trade for profits. As stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

65.     Even estimates by attorneys for the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[11] The 2016 Trafficking in Persons Report issued by the United States Department of

---

[11] U.S. Dep't of State. 2016. 2016 Trafficking in Persons Report, at 387. Available at: https://www.state.gov/documents/organization/258876.pdf.

State also confirmed that human trafficking occurs in the hospitality industry in the United States.

66.     The complicity and participation of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection by law enforcement. Sex trafficking ventures move from place to place, and usually from hotel to hotel, so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with certain hotels and hotel chains, including the hotels named in this complaint — they know it is unlikely that they will be disturbed and highly unlikely that hotels will act to protect victims.  Instead, hoteliers protect traffickers and profits.

67.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

68.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Washington Attorney General, Love 146, and EPCAT, among numerous others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[12]

---

[12] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

69.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants have been aware of or should have been aware of since before Plaintiff was trafficked, are specific to the hotel industry. These include learning to identify warning signs and indicators of sex trafficking so that it can be stopped.  Signs include but are not limited to:

     a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

     b.  Individuals show signs of physical abuse, restraint, and/or confinement;

     c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

     d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

     e.  Individuals lack freedom of movement or are constantly monitored;

     f.  Individuals avoid eye contact and interaction with others;

     g.  Individuals have no control over or possession of money or ID;

     h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

     i.  Individuals have few or no personal items—such as no luggage or other bags;

     j.  A group of girls appears to be traveling with an older female or male;

     k.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

l.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

m.   Possession and presence of bulk sexual paraphernalia such as condoms or lubricant;

n.   Possession or use of multiple cell phones;

o.   Possession or use of large amounts of cash or pre-paid cards;

p.   Inability to come and go freely from the hotel;

q.   People watching others from vehicles or by loitering around the premises;

r.   Solicitation in and around the hotel;

s.   Money exchanged in common areas, including hallways, lobbies, and parking lots;

t.   Women dressed provocatively and accompanied by men;

u.   Men or women with weapons;

v.   Multiple non-guest men coming in and out of a particular hotel room;

w.   Signs of injury on men or women whom seem to be controlled or watched by others;

x.   Sexual supplies including lubricants and devices in rooms visible to cleaning staff;

y.   Towels with blood;

z.   Excess towels and sheet requested per night;

aa.  Excessive condoms in trash taken by cleaning staff;

bb.  Signs of verbal and physical abuse, including yelling, screaming, and signs of physical injury;

cc. Women appearing to be under the influence of drugs or alcohol while being transported in and out of the hotel or taken from room to room;

dd. Asking for rooms away from other guests;

ee. Asking for rooms with separate entrances/exits that can be propped open for non-guests;

ff.  Paying cash on a nightly basis or in increments for extended periods of time;

gg. Paying with stolen credit cards; and

hh. Paying with credit cards online that are not in hand or do not have a matching ID.

70.     At all times of trafficking alleged herein, Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking and should have seen signs of the sex trafficking of Plaintiff that were observed by and observable by Defendants.

71.     Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, including the subject properties where Plaintiff was trafficked, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of the hotels.

72.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, brands, owners, operators and employees can identify and respond to this trafficking, it has become apparent that the decision of Defendants to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels, is a conscious

decision to financially benefit by supporting and facilitating unlawful sex trafficking.

73.     The United States is ranked one of the worst countries in the world for human trafficking according to a 2019 report released by the Department of State.

74.     The Asian American Hotel Owners Association has had a complete guide and trainings on how to prevent human trafficking at hotels for several years, including during the times Plaintiff was trafficked at Defendants' hotels and motels. Based upon information and belief, Defendants' family members have been leaders in the organization and all Defendants have known about how to identify and prevent sex trafficking for several years but chose not to do so.

75.     From 2010 to 2023, the Fresno Economic Opportunities Commission's Central Valley Against Human Trafficking (VVAHT) identified 2,162 human trafficking victims in the area and 85.1% were sex trafficking victims. CVHAT has offered and provided training and public awareness support for multi-sector professionals, including for hotels and motels and Defendants, since 2009.

76.     It is public knowledge that in 2015, the FBI targeted several hotels and motels in Fresno, California during a nationwide human trafficking operation and were able to save victims in Fresno, California at that time.

77.     In or around 2018 and in 2019, Fresno Mayor, Lee Brand, called together a group of leaders and created the Human Trafficking Initiative in Fresno County in attempt to combat the known issues with human trafficking, including at the hotels in Fresno and specifically along Parkway Drive where the Palace Inn and other high-crime hotels are located. Highlighting the long-term problem, leaders in the group at the time described the hotels and motels along Parkway Drive as magnets for illegal activity and human trafficking.

78.     In or around 2018, Fresno's Administration organized a Motel Owners Association in attempt to better enforce building codes and prevent illegal activity and human trafficking that was rampant at hotels and motels in Fresno.

79.     In 2023, the Clovis Police Department Special Enforcement Team arrested six men in connection to sex trafficking around Fresno County, including in Clovis.

80.     The decades-old problem still exists, and defendants are still participating in sex trafficking ventures.

81.     In 2024, investigative reporter, Edward Smith, reported that Fresno Police Chief, Paco Balderrama stated that gangs are trafficking girls and women more than drugs to fund their enterprise, including gang wars and bail money. Balderama said the arrests related to sex trafficking were going up each year.

82.     In 2024, U.S. Immigration and Customs Enforcement, Homeland Security Investigations, Fresno Police Department Vice Unit, and Fresno County District Attorney's Investigators conducted a multi-day operation to combat child exploitation and human trafficking in the Fresno area and ten women and girls were rescued and twenty-one (21) arrests were made.

**<u>Defendants and Jane Doe's Traffickers Participated in a Sex Trafficking Venture that Involved Abusing and Trafficking Jane Doe by Forcing and Coercing Jane Doe to Engage in Commercial Sex for Their Benefit.</u>**

83.     From about 2010 to 2016, Plaintiff was a victim of sex trafficking in Fresno County, California.

84.     In about 2010, after Plaintiff left an abusive relationship, she was lured into a hotel by a man that said he would help her out by buying her a hotel room for the night.  The man drugged, trapped, and controlled her thereafter with severe abuse, weapons, threats, physical force, manipulation and coercion. The man

was a gang member who proceeded to sell Plaintiff for sex with the help of other gang members and hoteliers, including Defendants.

85.     In or about 2010, Plaintiff was held captive by her traffickers and not allowed to leave her traffickers' view.  She was whipped with objects, including coat hangers.  She was not allowed to sleep much, and food and other basic necessities were withheld unless she obeyed.

86.     Plaintiff's traffickers told her they would kill her and her family if she ran.  They identified her daughter, likely from her identification documents that they stole from her, and often threatened to kill her daughter if she did not comply. Plaintiff believed that her traffickers and their gang would indeed kill her and her daughter.

87.     Nonetheless, Plaintiff attempted to run and attempted to escape on multiple occasions and was nearly run over by a vehicle and brutally beaten as a result.

88.     Plaintiff's traffickers escorted and took her to and from various hotels and motels, including Defendants' hotels and motels, where they knew they could conduct their criminal activities without interruption or risk.

89.     At all relevant times, Plaintiff's traffickers would sell Plaintiff and other women and girls for weeks at a time at each location and move them back and forth from hotels and motels in Fresno, California, including at Defendants' hotels and motels.

90.     After a period of time, Plaintiff's traffickers would beat and threaten victims, including Plaintiff, enough that the traffickers felt they had forced victims into submission and would then feel comfortable forcing the victims to go stand on nearby corners and walk the streets around the hotels to solicit men as the traffickers watched and followed nearby with weapons.

91.     Plaintiff's traffickers had people in charge of watching Plaintiff and others.  They would always follow, stand nearby and/or watch.  The traffickers' affiliates would be in the nearby room, lurking in hallways, and in parking lots while Plaintiff was being trafficked in and out of the hotels.  The fact that she was not free to come and go and was being ushered, escorted and watched was obvious for anyone that would have been watching, whether in person, via camera footage, through agents and employees, or all three.

92.     Plaintiff was trafficked for sex at the Palace Inn located at or about 797 N. Parkway Drive in Fresno, California regularly from about 2010 to 2016.

93.     Plaintiff was trafficked for sex at the Kings Canyon Motel located at or about 4770 Cesar Chavez Blvd. in Fresno, California regularly from about 2010 to 2016.

94.     Plaintiff was trafficked for sex at the Vagabond Inn located at or about 2570 S. East Ave in Fresno, California regularly from about 2010 to 2016.

95.     Plaintiff was trafficked for sex at the Days Inn located at or about 2640 2nd Street in Fresno, California regularly from about 2010 to 2016.

96.     Plaintiff was trafficked for sex at the Red Roof Inn located at 4141 Blackstone Avenue in Fresno, California regularly from about 2013 to 2016.

97.     For approximately six years, Plaintiff's traffickers rotated between hotels and chose the subject hotels as their most frequented due to the relationships between the traffickers and the hotel employees that allowed the traffickers free reign to conduct their illegal trafficking business.

98.     The subject hotels were used by Plaintiff's traffickers for several days and often weeks at a time with Plaintiff and her traffickers encountering the same owners, employees and/or staff.

99.     Plaintiff's traffickers would use the same subject locations so often that her traffickers interacted with Defendants' employees, agents and/or staff as if they

knew each other on a friendly basis.  Hotel staff treated her traffickers as friends, fellow gang members and/or regular guests and accommodated the traffickers with room requests and allowing her traffickers to do as they pleased around the hotels and parking lots, including carrying weapons, exchanging money with johns repeatedly, loitering and watching the rooms and victims, selling and taking drugs, and abusing victims. The front desk and other staff would consistently see Plaintiff with her traffickers and would have realized they kept returning and exhibiting the same red flags of trafficking over and over again for years.

100.    Due to the relationships between Defendant's employees and agents and Plaintiff's traffickers, Plaintiff understood that the subject hotels' and motels' staff, employees and owners would not help her and that she would likely be beaten or killed if she sought help from them.

101.    To control Plaintiff, her traffickers threatened her, threatened her family, beat her and left bruises and marks, drugged her, withheld life necessities like food and water, mentally manipulated her into believing she was nothing, and threatened to take her life on numerous occasions. Eventually, Plaintiff believed that if she did not obey, she would be killed.

102.    All of Plaintiff's belongings were taken by her traffickers and she was only allowed to have or use what they decided she could have or use at any given moment.  Plaintiff's traffickers were always watching her.

103.    For long periods of time, Plaintiff's traffickers would not allow her to sleep, eat or drink water. She became very weak and dehydrated. She looked sickly, unwell, and unhealthy.

104.    Plaintiff's traffickers would drug her to make her submit easier and quicker.

105.    Plaintiff's traffickers would beat her if she did not make enough money for them.  The beatings were loud.  Plaintiff was beaten at the subject Palace Inn,

Red Roof Inn, Kings Canyon Motel, Vagabond, and Days Inn regularly for weeks at a time from about 2010 to 2016 and none of the employees tried to help her when it was observable and hearable.

106.   Plaintiff's traffickers would sell minors for sex at the subject hotels and at times would restrain them in rooms and drug them. Cleaning staff at the subject hotels and motels would have seen this, as well as other signs of trafficking, regularly.

107.   Plaintiff believes the subject hotels and motels knew exactly what was going on because they could see most of what went on, including but not limited to the fact that they were "buddy buddy" with the traffickers and could see in person and through cameras the physical control, that her traffickers were controlling her, that she did not have her ID and other belongings in her control, that her traffickers were also controlling young girls, that Plaintiff was drugged from time to time, that she was escorted to and from the hotel, that she was being watched by her traffickers, that men were coming in and out of her room repetitively each night, that her traffickers were paying in cash, that men that were not guests were coming on and off the property and in and out of her room after staying only a short period, that her traffickers were exchanging money with the men that came in and out in public areas, that Plaintiff did not look healthy, that Plaintiff had visible injuries and bruises, that Plaintiff's traffickers would get an additional room next door to the one they put her in and that solicitation was going on at and around the hotels.

108.   Plaintiff's traffickers did not have to show any type of ID at the subject hotels and motels.  The rooms were booked, and Plaintiff would be escorted to the rooms with ease because Plaintiff's traffickers knew the employees at each of the subject hotels and motels.

109.   Plaintiff was severely punished if she did not comply with every command from her traffickers.

110.     During this time Plaintiff was under the control of her traffickers and endured multiple beatings, threats and manipulation. Plaintiff was beaten so frequently by her traffickers that she would often have visible bruises and injuries.

111.     Staff at the subject motels saw and heard the fights occurring on their properties, including but not limited to involving Plaintiff and her traffickers, but did not call the police or intervene in any way to help.

112.     Staff at the subject motels saw the visible bruises and injuries on Plaintiff while she was with her traffickers.

113.     No matter how much Plaintiff begged and fought, her traffickers would not allow her to leave.

114.     Plaintiff's traffickers often had multiple girls at the hotels. There was always traffic going in and out of the multiple rooms rented by Plaintiff's traffickers.

115.     During the years Plaintiff's traffickers held her captive at the subject hotels and motels, Plaintiff's traffickers or Plaintiff would ask for an extraordinary number of linens and towels throughout their stays as a direct result of the trafficking.

116.     While staying at the subject hotel and motel locations, Plaintiff was forced to engage in commercial sex with multiple people per day, at all hours of the day and night.

117.     Plaintiff's seller traffickers would either book her buyers (also traffickers) or force her to walk outside, get the buyer traffickers to agree to pay, and bring them back to the hotel rooms. Plaintiff's traffickers watched her while this went on until a buyer would agree and then her trafficker would follow them back and get the money. She was forced to engage in commercial sex acts, often abused while it took place, and the buyer would then leave shortly after.  The money would be exchanged before or after and often in view of hotel or motel staff.

118.    Plaintiff had severe blisters from her traffickers making her stand outside and walk back and forth.

119.    Each stay at the named subject hotel locations resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-to-day basis; requesting certain rooms next to each other away from other guests; obvious signs of illegal drug use; frequent requests for clean linens or towels; unusually large numbers of used condoms in the trash; unusually large numbers of male visitors going in and out of Plaintiff's room at all times during the day and night; a male with multiple girls and/or women; visible signs of physical abuse; visible signs of Plaintiff's malnutrition; women wearing clothing inappropriate for the weather; men and women lurking around the hotel watching Plaintiff and other victims; and loud noises of abuse and other violence audible to staff and/or other rooms.

120.     These red flags were open and obvious to anyone working at the subject hotel locations and lasted for six years.

121.    Plaintiff consistently witnessed clear signs of others being sex trafficked at the same times she was trafficked at the subject hotels and motels, which means that it should have been easily detectible upon any reasonable inspection.

122.    It became clear to Plaintiff during the time of her trafficking that her traffickers' and the hotels' sex trafficking venture was a routine business operation that the hotels were welcoming of and participating in.  They were "in on it."

123.    Throughout the years of her being trafficked at the subject Days Inn and Red Roof Inn, Plaintiff witnessed people that appeared to be in management positions that were not the regular, on-site employees she was familiar with come to the property and the trafficking venture was operating as normal when these individuals would be there.  Plaintiff believes such individuals appeared to be and

were likely associated with other entities like parent and brand companies that controlled how the properties were operating.

124.    The on-site employees, as well as the brand and corporate employees would have seen the signs of trafficking at the Days Inn and Red Roof Inn because it happened throughout the day and nights when Plaintiff was at each place regularly for years.

125.    Based upon information and belief, sex trafficking was occurring at Defendants' properties daily for the years Plaintiff was trafficked as mentioned above.

126.    Based upon information and belief, Plaintiff's traffickers and their affiliates and gang members had been trafficking people regularly for sex and forcing people to engage in commercial sex at the subject hotels for years before Plaintiff was trafficked there by them because Plaintiff's traffickers and associates were familiar with the properties and employees at the properties; and the sex trafficking seemed to be accepted, normal and part of the hotel operations as if it had been occurring for a long period of time.

127.    Several security guards, front desk managers and owners at Defendants' properties would participate in the trafficking as buyers and/or by exchanging rooms for sex or drugs and would protect and do business with traffickers including Plaintiff's traffickers.

**<u>Palace Inn Defendants Knew About and Participated in the Trafficking of Plaintiff and Others at the Palace Inn.</u>**

128.    Palace Inn Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and the subject Palace Inn in particular.

129.     Use of the subject Palace Inn location for sex trafficking was well-known to Palace Inn Defendants, Jagrati D. Bhakta and Roger Bhakta.

130.     Based upon information and belief, Jagrati D. Bhakta and Roger Bhakta have ownership interests in and family that owns several other hotels and motels that also participate in sex trafficking.

131.     Based upon information and belief, Palace Inn Defendants have family members that own hotels near the Palace Inn that have been arrested and convicted for their participation in sex trafficking at those hotels that they owned and operated.

132.     Palace Inn is directly on Parkway Drive, which is a known hotspot and cesspool for sex trafficking and other heinous crimes—and has been for decades.

133.     Palace Inn Defendants saw and heard sex trafficking occurring at the subject Palace Inn located at or about 797 N. Parkway Drive in Fresno California from 2010 to 2016, including the trafficking of Plaintiff there.  Palace Inn Defendants communicated with Plaintiff's traffickers about their trafficking of Plaintiff.  The traffickers made clear that they controlled Plaintiff and that she needed to be watched at all times.  Defendants understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Palace Inn and the traffickers' profits.

134.     Upon information and belief, before and at the time Plaintiff was trafficked at the subject Palace Inn, Palace Inn Defendants saw Plaintiff being held captive, controlled, drugged, abused, hit and trafficked for sex there.  Jagrati Bhakta, Roger Bhakta and their employees directly witnessed all signs of sex trafficking, including the trafficking of Plaintiff, described above.

135.     The police responded to 911 calls from outsiders and guests at the Palace Inn regularly and more than 1,000 times from 2010 to 2016 for criminal activity, often including crimes of and related to sex trafficking, rape, prostitution,

drugs and overdosing, domestic violence, assault and battery, deaths, criminals with warrants, and serious bodily injuries requiring emergent medical attention.

136.   Palace Inn Defendants knew staff at its properties were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs"; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms where victims were trafficked in without ID; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property.

137.   Palace Inn Defendants have direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

138.   Information that has become public through news stories establishes the entrenched and pervasive nature of the Defendants' role in providing a venue where sex trafficking has continued unabated for years. Palace Inn Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff.

139.     During the period Plaintiff was trafficked at the subject Palace Inn, there were obvious signs that her traffickers were engaged in sex trafficking.

140.     Other women and girls were trafficked by other traffickers at the same Palace Inn at the same time as Plaintiff and Defendants saw and heard the signs of that sex trafficking nearly daily too.

141.     Other women and girls were trafficked by Plaintiff's traffickers at the same Palace Inn and at the same time as Plaintiff.   Palace Inn Defendants knew traffickers were controlling women and girls at the Palace Inn and forcing the women and girls to have sex there.

142.     Palace Inn Defendants were at the subject Palace Inn property often from 2010 to 2016 and while Plaintiff was being trafficked there.

143.     Plaintiff's traffickers would get the rooms, did not appear to have to show any form of ID, were allowed to pay in cash nightly and would linger around the hotel or in the parking lot while Plaintiff was forced to have sex with non-guest buyers at the subject Palace Inn. This was all in plain sight of Palace Inn Defendants and their employees at the subject locations. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day that Plaintiff was trafficked there for weeks at a time, for years. Employees and traffickers worked together to watch the victims, including Plaintiff.  Palace Inn Defendants made an active choice not to call the police or notify law enforcement about the trafficking that they knew was going on at the subject Palace Inn for years.

144.     There was heavy foot traffic in and out of the rooms where Plaintiff and other victims were being harbored. This foot traffic involved men who were not hotel guests and did not show identification. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual

hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees and the Palace Inn owners that were located at the front desk and around the property.   Some employees appeared to live at the property and were always around. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it themselves while at the property and while living at the property, as well as by and through their employees and agents who were at the property and also observed all of the signs of Plaintiff's trafficking.

145.     Plaintiff's traffickers did not try to hide their criminal conduct, including human trafficking, from Palace Inn Defendants because Palace Inn Defendants allowed, facilitated, and participated in the trafficking.  Palace Inn Defendants could easily see what was going on because it was in plain view of them and their employees.

146.     Plaintiff would have been seen by hotel employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy.

147.     There were obvious signs of Plaintiff's trafficking visible to Palace Inn Defendants that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

148.     When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees that she passed by regularly at the Palace Inn for years.

149.     Upon information and belief, multiple employees of each Defendant, including the Palace Inn Defendants, and including management-level employees, observed, or were made aware of the obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

150.     Based upon information and belief, Palace Inn Defendants read all online reviews about their property from 2003 to the present.  Numerous reviews were left online about Palace Inn that directly put Palace Inn Defendants on notice of red flags of sex trafficking, including from 2010 to 2016.  Reviews specifically stated that room doors were opening and closing all night, no ID was required to rent the room; prostitutes could be seen around the property and going in and out of rooms, prostitutes were crying and being yelled at, screaming heard from other rooms, staff drinking beers with other guests in guest rooms, fights happening regularly, and describing "ladies of the night" and how unsafe the property was as a whole, including due to sketchy and scary looking men.

151.     As such, Defendants knew and should have known that Plaintiff was being trafficked at the subject motel locations named herein, including the Palace Inn.

152.     At all times relevant, from 2010 to 2016, Palace Inn Defendants profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers for her trafficking.

**Kings Canyon Motel Defendants Knew About and Participated in the Trafficking of Plaintiff and Others at Kings Canyon Motel**

153.     Kings Canyon Motel Defendants' knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing

and widespread at their specific locations and the subject Kings Canyon Motel in particular.

154.    Use of the subject Kings Canyon Motel, located at or about 4770 Cesar Chavez Boulevard in Fresno, California, for sex trafficking was well-known to the Patels, Kings Canyon Motel Defendants.  Kantilal M. Patel and Madhuben Kantilal Patel, as well as the trustees of the Patel K B & I K Living Trust, Kantilal B. Patel and Indiraben K. Patel, are part of a long line of Patels that have owned, managed and controlled cheap hotels and motels that have served as human trafficking hubs for decades throughout the United States.

155.    Based upon information and belief, the Kings Canyon Defendants are family members that have other family members that own several other hotels and motels that also participate in sex trafficking ventures.

156.    Based upon information and belief, Kings Canyon Motel Defendants have family members that owned motels that have been shut down for prostitution, sex trafficking, and other criminal activity.  Kings Canyon Motel Defendants are very well aware of the sex trafficking signs and red flags, as well as the fact that it has occurred at hotels and motels for decades and have chosen to allow it to happen at their property, including the subject Kings Canyon Motel from 2010 to 2016, despite that knowledge.  The Patel K B & I K Living Trust, by and through its trustees, Kantilal B. Patel and Indiraben K. Patel, knowingly allowed sex trafficking to take place at the Kings Canyon Motel from 2009 to about May 2012. Kantilal M. Patel and Madhuben Kantilal Patel knowingly allowed sex trafficking to occur at the Kings Canyon Motel from about May 2012 to 2016 while Plaintiff was trafficked there.

157.    Kings Canyon Motel has been a known hotspot and cesspool for sex crimes and other heinous crimes for decades.

158.     Kings Canyon Motel Defendants saw and heard sex trafficking occurring at the subject Kings Canyon Motel located at or about 4770 Cesar Chavez Boulevard in Fresno California from 2010 to 2016 during the times that each owned and controlled the subject motel, including the trafficking of Plaintiff there.  Kings Canyon Motel Defendants communicated with Plaintiff's traffickers about their trafficking of Plaintiff.  The traffickers made clear that they controlled Plaintiff, and it was clear that Plaintiff's traffickers were watching Plaintiff at all times and forcing her to engage in commercial sex.  Defendants understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Kings Canyon Motel and the traffickers' profits, including Kings Canyon Motel Defendants' profits.

159.     Upon information and belief, before and at the time Plaintiff was trafficked at the subject Kings Canyon Motel, Kings Canyon Motel Defendants saw victims, including but not limited to Plaintiff, being held captive, controlled, drugged, abused, hit and trafficked for sex there.  Kings Canyon Motel Defendants and their employees directly witnessed all signs of sex trafficking, including the trafficking of Plaintiff, described above.

160.     The police responded to 911 calls from outsiders and guests at the Kings Canyon Motel regularly and more than one hundred fifty (150) times from 2010 to 2016 for criminal activity, often including crimes related to sex trafficking, domestic violence, assault and battery, deaths, criminals with warrants, minor runaways, fights and serious bodily injuries requiring emergent medical attention.

161.     Kings Canyon Motel Defendants knew staff at its properties were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs";

allowing daily payments of cash for extended stays; complying with requests for specific rooms; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms where victims were trafficked in without ID; allowing guests to use illicit drugs on property; allowing violence to occur at the property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property.

162.    Kings Canyon Motel Defendants have direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of sketchy people, constant knocking on doors, prostitution, drugs, and other signs of trafficking.  Kings Canyon Motel Defendants read and respond to online reviews, and one can see their acknowledgements and responses online, so Kings Canyon Motel Defendants saw the reviews that put them on notice or should have put them on notice of trafficking occurring at the Kings Canyon Motel from 2010 to 2016 and likely before and after.

163.    Kings Canyon Motel Defendants have provided the means necessary for traffickers to traffic victims, including Plaintiff.

164.    During the period Plaintiff was trafficked at the subject Kings Canyon Motel, there were obvious signs that her traffickers were engaged in sex trafficking.

165.    Other women and girls were trafficked by other traffickers at the same Kings Canyon Motel at the same time as Plaintiff and Defendants saw and heard the signs of that sex trafficking too.

166.     Other women and girls were trafficked by Plaintiff's traffickers at the same Kings Canyon Motel and at the same time as Plaintiff.  Kings Canyon Defendants knew traffickers were controlling women and girls at the Kings Canyon Motel and forcing the women and girls to have sex there, but Kings Cayon Motel Defendants only cared about getting money for rooms and chose not to intervene or do anything to stop the known trafficking and other crimes occurring at the property.

167.     Kantilal B. Patel and Indiraben K Patel were at the subject Kings Canyon Motel property often from 2010 to 2012 and while Plaintiff was being trafficked there.  Based upon information and belief, the Patels were running the front office and most operations related to the Motel themselves.

168.     Kantilal M. Patel and Madhuben Kantilal Patel were at the subject Kings Canyon Motel property often from 2012 to 2016 and while Plaintiff was being trafficked there.  Based upon information and belief, the Patels were running the front office and most operations related to the Motel themselves.

169.     Plaintiff's traffickers would get the rooms, did not appear to have to show any form of ID to the Kings Cayon Motel Defendants or their employees, were allowed to pay in cash nightly and would linger around the hotel or in the parking lot throughout the nights while Plaintiff was forced to have sex with non-guest buyers at the subject Kings Canyon Motel. This was all in plain sight of Kings Canyon Motel Defendants and their employees. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day that they stayed there for weeks at a time, for years. Employees and traffickers worked together to watch the victims, including Plaintiff.  Kings Canyon Motel Defendants made an active choice not to call the police or notify law enforcement about the trafficking that they knew was going on at the subject Kings Canyon Motel for years.

170.     There was heavy foot traffic in and out of the rooms where Plaintiff and other victims were being harbored at Kings Cayon Motel. This foot traffic involved men who were not hotel guests and did not show identification. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Their comings and goings were visible to hotel employees and the Kings Canyon Motel owners that were located at the front desk and around the property. Some employees appeared to live at the Kings Canyon Motel property and were always around.  This may have been the Patels who were trustees and then owners. A reasonable hotel would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it themselves while at the property and while living at the property, as well as by and through their employees and agents who were at the property and also observed all of the signs of Plaintiff's trafficking.

171.     Kings Canyon Motel Defendants allowed, facilitated, and participated in the trafficking.  Kings Canyon Motel Defendants could easily see what was going on because it was in plain view of them and their employees.

172.     Plaintiff would have been seen by Kings Canyon Motel employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy.

173.     There were obvious signs of Plaintiff's trafficking visible to Kings Canyon Motel Defendants that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, condoms, sex paraphernalia, and lingerie. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

174.     When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees that she passed by regularly at the Kings Canyon Motel for years.

175.     Upon information and belief, multiple employees of each Defendant, including the Kings Canyon Motel Defendants, and including management-level employees, observed, or were made aware of the obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

176.     Based upon information and belief, Kings Canyon Motel Defendants read all online reviews about their property while each owned and controlled it—whether of their own right or by and through a trust.  Numerous reviews were left online about Kings Canyon Motel that directly put Kings Canyon Motel Defendants on notice of red flags of sex trafficking, including from 2010 to 2016.

177.     As such, Kings Canyon Motel Defendants knew and should have known that Plaintiff was being trafficked at the subject Kings Canyon Motel regularly from 2010 to 2016.

178.     At all times relevant, from 2010 to 2016, Kings Canyon Motel Defendants profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers for her trafficking at the times that each defendant owned or controlled it—outright or by and through the subject trust.

**Vagabond Inn Defendants and Vagabond Inn Corporation Knew About and Participated in the Trafficking of Plaintiff and Others at the Vagabond Inn**

179.     Vagabond Inn Defendants and Vagabond Inn Corporation have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and the subject Vagabond Inn.

180.     The subject Vagabond Inn, located at 2570 S. East Avenue in Fresno, California, is next to a truck stop and has been known to the community as a prostitution and crime hub for several years, including before Plaintiff was trafficked there.  It now goes by "Fresno Inn" but the Vagabond sign still remains and at all relevant times it was the "Vagabond Inn."

181.     Before and at all relevant times, the Vagabond Inn Defendants and Vagabond Inn Corporation knew that the Vagabond Inn was used for sex trafficking.

182.     The Vagabond Inn Corporation has approximately 29 franchisees that are located in the western United States.  It knows details about each property and is involved in the day-to-day operations at each.

183.     Based upon information and belief, the Vagabond Inn Corporation franchised the subject Vagabond Inn to the Vagabond Inn Defendants several years ago before Plaintiff was trafficked there knowing that the property was already a cesspool for crime and criminal activity, including prostitution and sex trafficking.

184.     Upon information and belief, Vagabond Inn Corporation conducts research and chooses what locations to enter into franchise locations with and knew before agreeing to franchise and operate the subject Vagabond Inn that it was in a location and on property by a truck stop and known for sex trafficking, sex crimes and other criminal activity.

185.     Vagabond Inn Corporation holds itself out to the public as the operator of the Vagabond Inns that it franchises and has made public statements about it being the one that is operating its franchised properties.  It advertises each property and provides details to the public in attempt to entice the public to rent rooms at the properties.

186.    Based upon information and belief, at all relevant times, the Vagabond Inn Defendants and Vagabond Inn Corporation had a written agreement that gave the Vagabond Inn control over the Vagabond Inn Defendants as it relates to booking and payment policies, safety and reports related to safety concerns, crime at the property, and to inspect the property and to make any changes necessary for the safety of guests at the property.

187.    Based upon information and belief, the Vagabond Inn Defendants reported to the Vagabond Inn Corporation about any and all criminal activity, including from 2010 to 2016, and it was known to the Vagabond Inn Corporation that criminal activity was ramped at the subject Vagabond Inn, that commercial sex was taking place daily and nightly and that people were forcing women and girls to engage in commercial sex by use of physical force, threats and coercion at the subject Vagabond Inn during that time.

188.    From 2010 to 2016, as well as before and after, Vagabond Inn Defendants spoke to police officers regularly who responded to calls from guests and the public related to crime, including rape, prostitution, domestic violence, assault and battery, death and other crimes arising out of sex trafficking, including sex trafficking itself.  During relevant times, the VICE unit responded to the Vagabond Inn related to sex trafficking. Vagabond Inn Defendants were directly made aware of the sex trafficking from law enforcement, traffickers, and other guests and victims.

189.    Based upon information and belief, Vagabond Inn Corporation was made aware of the police activity, response to sex crimes including sex trafficking, and police reports from Vagabond Inn Defendants and by and through their own audits and inspections of the subject Vagabond Inn.

190.    Based upon information and belief, Vagabond Inn Corporation conducted regular inspections of the subject Vagabond during the time Plaintiff

was trafficked there and directly witnessed sex trafficking red flags, including solicitation, women being forced to stand around the motel and solicit sex, traffickers standing around the motel with weapons watching, money exchanges, men going in and out of rooms that were not guests, bruised and battered women, women dressed in provocative clothing being ushered around by traffickers, drug activity, and other crime.

191.    Based upon information and belief, the Vagabond Inn Corporation has an ownership interest in and/or owns several other Vagabond Inn motels and other hotels that have participated in sex trafficking ventures and where VICE units and other police departments have made several arrests and found adult and minor victims being trafficked for sex.

192.    Vagabond Inn Corporation has access to and does review and read online reviews for its properties that it owns and/or operates as franchisors, including the subject Vagabond Inn. Reviews from most of the Vagabond Inn locations that Vagabond Inn Corporation has a franchise and ownership interest in put the Vagabond Inn Corporation on direct notice that prostitution and sex trafficking are occurring there.

193.    Vagabond Inn Defendants and Vagabond Inn Corporation are well aware of the sex trafficking signs and red flags, as well as the fact that it has occurred at hotels and motels for decades and have chosen to allow it to happen at their property, including the subject Vagabond Inn from 2010 to 2016, despite that knowledge.

194.    The subject Vagabond Inn in Fresno has been a known hotspot and cesspool for sex crimes and other heinous crimes since before 2010.

195.    Vagabond Inn Defendants saw and heard sex trafficking occurring at the subject Vagabond Inn located at or about 2570 S. East Avenue in Fresno California from 2010 to 2016, including the trafficking of Plaintiff there.  Vagabond

Inn Defendants communicated with Plaintiff's traffickers about the trafficking of Plaintiff. Vagabond Inn defendants knew the traffickers and knew that the traffickers controlled Plaintiff and it was clear that Plaintiff's traffickers were watching Plaintiff at all times and forcing her to engage in commercial sex. Vagabond Inn Defendants understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Vagabond Inn and the traffickers' profits, including Vagabond Inn Defendants' and Vagabond Inn Corporation's profits.

196. Vagabond Inn Corporation inspected the property from 2010 to 2016 and saw the red flags of Plaintiff's trafficking and knew or should have known that it was profiting and benefiting from the room rentals that directly resulted from the trafficking of Plaintiff at the subject Vagabond Inn.

197. Upon information and belief, before and at the time Plaintiff was trafficked at the subject Vagabond Inn, Vagabond Inn Defendants and Vagabond Inn Corporation saw victims, including but not limited to Plaintiff, being held captive, controlled, drugged, abused, hit and trafficked for sex there. Vagabond Inn Defendants, Vagabond Inn Corporation, and/or their employees while working in the course and scope of their employment with each, directly witnessed all signs of sex trafficking, including the trafficking of Plaintiff described above.

198. The police responded to 911 calls from outsiders and guests at the subject Vagabond Inn regularly and more than six hundred fifty (650) times from 2010 to 2016 for criminal activity, including crimes related to sex trafficking, prostitution, rape, domestic violence, assault and battery, deaths, criminals with warrants, fights and serious bodily injuries requiring emergent medical attention.

199. Vagabond Inn Defendants and Vagabond Inn Corporation were made aware of those sex crime incidents during the subject times that Plaintiff was

regularly trafficked there for sex and did not do anything to try to prevent the sex crimes, including sex trafficking, from continuing to occur at the property.

200.    Since at least 2010, Vagabond Inn Defendants and Vagabond Inn Corporation knew employees and staff at its properties, including the subject Vagabond Inn, were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs;" allowing daily payments of cash for extended stays; complying with requests for specific rooms; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms where victims were trafficked without ID; allowing guests to use illicit drugs on property; allowing violence to occur at the property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property.

201.    Reviews show that Vagabond Inn Defendants and/or their employees would drink and do drugs with regulars at the subject Vagabond Inn; allow sex crimes to take place; allow drug dealers, victims, traffickers and criminals to prowl the property at all hours; allow violence and screaming; allow solicitation; and ignored reports of the same to protect the traffickers.

202.    Vagabond Inn Defendants and Vagabond Inn Corporation have direct access to, read and respond to reviews left by guests on websites wherein guests

frequently complain about the prevalence of sketchy people, constant knocking on doors, prostitution, drugs, unhealthy conditions, unsafe conditions, blood in rooms, criminal participation by employees, and other signs of trafficking at the subject Vagabond Inn.  Vagabond Inn Defendants and Vagabond Inn Corporation read online reviews, so they saw the reviews that put them on notice or should have put them on notice of trafficking occurring at the subject Vagabond Inn from 2010 to 2016 and likely before and after.

203.    Vagabond Inn Defendants and Vagabond Inn Corporation have provided the means necessary for traffickers to traffic victims, including Plaintiff.

204.    At all relevant times, Vagabond Inn Defendants and Vagabond Inn Corporation arranged with traffickers to have victims housed in specific areas and rooms within the subject Vagabond so they were segregated from legitimate customers.

205.    At all relevant times, Vagabond Inn Defendants and Vagabond Inn Corporation allowed traffickers to use other people's identification or did not require any form of documentation, knowing illegal activity that would occur, and understanding that sometimes payment would not be made until after the forced commercial sex acts.

206.    Vagabond Inn Defendants and Vagabond Inn Corporation often charged higher room rates to traffickers in exchange for permitting trafficking activities to be conducted at the subject Vagabond Inn and accommodating late, cash payments.

207.    Vagabond Inn Defendants' employees often participated and engaged in trafficking activities at the subject Vagabond Inn.

208.    Vagabond Inn Corporation knew or should have known about the Vagabond Inn Defendants' employees' participation and engagement in trafficking

activities at the subject Vagabond Inn because it was readily apparent upon any reasonable inspection from 2010 to 2016.

209.    Based upon information and belief, from 2010 to 2016, Vagabond Inn Defendants and their employees, warned members and associates of the trafficking enterprise, including Plaintiff's traffickers, about law enforcement activity and inquiries.

210.    During the period Plaintiff was trafficked at the subject Vagabond Inn, obvious signs existed and were visible to anyone paying attention that her traffickers were engaged in sex trafficking.

211.    Other women and girls were trafficked by other traffickers at the same Vagabond Inn at the same time as Plaintiff and Vagabond Inn Defendants and Vagabond Inn Corporation saw and heard the signs of that sex trafficking too.

212.    Other women and girls were trafficked by Plaintiff's traffickers at the same Vagabond Inn and at the same time as Plaintiff.  Vagabond Inn Defendants and Vagabond Inn Corporation knew traffickers were controlling women and girls at the subject Vagabond Inn and forcing the women and girls to have sex there, but Vagabond Inn Defendants and Vagabond Inn Corporation only cared about getting money for rooms and chose not to intervene or do anything to stop the known trafficking and other crimes occurring at the property.

213.    Defendant trustees of the Chahil Family Trust, Boota Singh Chahil and Kuldip Kaur Chahil, were physically at the subject Vagabond Inn often from 2010 to 2016 while Plaintiff was being trafficked there.  Based upon information and belief, the Chahils were aware of all operations and criminal activity because they had a few employees that were engaged in such activity that directly reported to the Chahils and the Chahils were at the property, inspected the property, conducted audits and were running major operations of the subject Vagabond Inn

such that they knew about the sex trafficking first hand and by and through their employees.

214.    At all relevant times, Plaintiff's traffickers would get the rooms, did not appear to have to show any form of ID to the Vagabond Inn Defendants or their employees, were allowed to pay in cash nightly and would linger around the hotel or in the parking lot throughout the nights while Plaintiff was forced to have sex with non-guest buyers at the subject Vagabond Inn multiple times per day for weeks. This was all in plain sight of Vagabond Inn Defendants, Vagabond Inn Corporation, and their employees and agents. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day that Plaintiff was trafficked there for weeks at a time, for years. Employees and traffickers worked together to watch the victims and employees would encourage truckers to participate. Vagabond Inn Defendants and Vagabond Inn Corporation made an active choice not to call the police or notify law enforcement about the trafficking that they knew was going on at the subject Vagabond Inn for years so that they would continue to profit from the sex trafficking ventures.

215.    Heavy foot traffic took place in and out of the rooms where Plaintiff and other victims were being harbored at the subject Vagabond Inn. This foot traffic involved men who were not hotel guests and did not show identification, but it also included truck drivers staying at the motel that were encouraged by hotel employees to participate. Several men came in and out of the subject hotel rooms in a single day. These individuals entered and left at unusual hours and were present at the hotel or in the room for brief periods of time. Their comings and goings were visible to hotel employees and the Vagabond Inn Defendants and Vagabond Inn Corporation that were located at the front desk and around the property.   Some employees and guests appeared to live at the Vagabond Inn and were always

around.  A reasonable hotel/motel company would have seen these regular "red flag" interactions at their property in plain sight and Defendants should have seen it themselves while at the property and while living at the property, as well as by and through their employees and agents who were at the property and also observed all of the signs of Plaintiff's trafficking.

216.    Vagabond Inn Defendants and Vagabond Inn Corporation allowed, facilitated, and participated in the trafficking.  Vagabond Inn Defendants and Vagabond Inn Corporation could easily see what was going on because it was in plain view of them and their employees and agents.

217.    Plaintiff would have been seen by Vagabond Inn Defendants' and Vagabond Inn Corporation's employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy. Other victims, including minor victims, of Plaintiff's traffickers would have been visible to the employees and agents too.

218.    There were obvious signs of Plaintiff's trafficking visible to Vagabond Inn Defendants and Vagabond Inn Corporation that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, condoms, sex paraphernalia, lingerie, loitering, drug use and selling, and solicitation. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

219.    When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees that she passed by regularly at the Vagabond Inn for years.

220.     Upon information and belief, multiple employees of each Defendant, including the Vagabond Inn Defendants and Vagabond Inn Corporation, and including management-level employees, observed, or were made aware of the obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment with each applicable defendant.

221.     Based upon information and belief, Vagabond Inn Defendants and Vagabond Inn Corporation read all online reviews about the subject Vagabond Inn property while each owned and/or controlled it.  Numerous reviews were left online about the Vagabond Inn that directly put defendants on notice of red flags of sex trafficking, including from 2010 to 2016.

222.     As such, Vagabond Inn Defendants and Vagabond Inn Corporation knew and should have known that Plaintiff was being trafficked at the subject Vagabond Inn regularly from 2010 to 2016.

223.     At all times relevant, from 2010 to 2016, Vagabond Inn Defendants and Vagabond Inn Corporation knowingly profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers related to her trafficking and the trafficking of others.

**Vagabond Inn Corporation Exercised Control Over the Subject Vagabond Inn and the Vagabond Inn Defendants.**

224.     Vagabond Inn Defendants owned the Vagabond Inn located at 2570 S. East Avenue in Fresno, California during the time Plaintiff was trafficked.

225.     Vagabond Inn Corporation is vicariously liable for the acts, omissions, and knowledge of the Vagabond Inn employees and staff of the subject Vagabond Inn because the employees and staff were Defendants' actual agents or subagents.

226.     Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendant Vagabond Inn Corporation, for parent companies to

set exacting brand quality standards, rules and to retain control over day to day operations, including things like the temperature at which coffee shall be served, room rates, documentation to be kept, how to handle crime, how to report crime, policies and procedures for staff to follow in response to suspected criminal activity, policies and procedures related to staff and employees engaging in criminal activity, employee and agent training, and to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

227.    Vagabond Inn Corporation Defendant provides their Vagabond locations with signage on and in front of the buildings and throughout the properties. This is being done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand, including the public statements and promises Vagabond Inn Corporation makes to the public about safety and comfort. This brand logo is usually displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

228.    Vagabond Inn Corporation provides their hotels branded locations brand name recognition, a marketing campaign, hotel listings, advertising, and participation in online hotel databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand programs, and company websites. Therefore, bookings and room reservations are primarily controlled by Parent Hotel Defendants.[13]

229.    Vagabond Inn Corporation subjects and at all relevant times subjected their hotel locations, including the subject Vagabond Inn, to detailed standards and requirements regarding the operation of the Vagabond Inn location named herein

---

[13] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the Vagabond Parent Hotel Defendant.

230.     Upon information and belief, Vagabond Inn Corporation requires its branded hotel properties, including the Vagabond Inn Defendants named herein, to use a property management system that is linked to the Vagabond Inn Corporation's corporate network and data center. This is to, among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

231.     Upon information and belief, per the relevant agreements, Vagabond Inn Corporation may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject Vagabond Inn during the subject time period, backed up with the ultimate threat of and ability to terminate the agreement.[14]

**Vagabond Employees and Staff Acted as Actual Agents of Defendant Vagabond Inn Corporation.**

232.     Vagabond Inn Corporation is vicariously liable for the acts, omissions, and knowledge of their employees and staff of the Vagabond Inn location described herein, which are Vagabond Inn Corporation's actual agents or subagents.

233.     Vagabond Inn Defendants subjected Vagabond Inn employees and agents to detailed training, standards and requirements regarding the operation of the Vagabond location named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by Vagabond Inn

---

[14] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

Corporation—and the Corporation retained the right to enforce its training, policies, rules and standards.

234.     Upon information and belief, the standards that Defendant Vagabond Inn Corporation imposed and imposes on their branded properties at all relevant times included but were not limited to the following:

      a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Vagabond Inn Fresno used at its Fresno location;

      b.  Covered virtually all aspects of hotel operations, including internal operating functions;

      c.  Dictated the specific manner in which Fresno Inn Defendants and hotel staff must carry out most day-to-day functions at the Vagabond Inn Fresno; and

      d.  Significantly exceeded what was necessary for Vagabond Inn Corporation to protect its registered trademarks.

235.     In addition to the ways described above, upon information and belief, Vagabond Inn Corporation Defendant exercised and reserved the right to exercise systemic and pervasive control over Vagabond Inn Defendants' day-to-day operation of the subject Vagabond Inn location during relevant times, including in the following ways:

      a.  Defendant Vagabond Inn Corporation required Vagabond Inn Defendants and management of the hotel to participate in training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Vagabond Inn Corporation Defendant to protect its registered trademarks;

b. Defendant Vagabond Inn Corporation provided training for hotel management and select hotel staff on-site at the Vagabond Inn location and Vagabond Inn Corporation went to the Vagabond Inn location;

c. Vagabond Inn Corporation required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. Vagabond Inn Corporation controlled training provided by Vagabond Inn Defendants to hotel staff by dictating the content of that training, especially related to human trafficking, providing required content for that training, and dictating the training methods used;

e. Vagabond Inn Corporation retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Vagabond Inn Fresno was required to purchase to operate the Vagabond Inn location, Vagabond Inn Corporation designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor such that it had to sign off or give permission;

g. Vagabond Inn Corporation required the Vagabond Inn Defendants to sign a technology, software, and data agreements governing the terms under which it must procure, store, share and use technical services, software and data related to the subject Vagabond Inn. Vagabond Inn Defendants were required to install, and use certain brands, types, make, and/or models of hardware, software, peripheral equipment, data storage, data sharing devices and

software and support services to perform internal operating functions at the subject Vagabond Inn;

h. Vagabond Inn Corporation consistently communicated with, directed, instructed, and got updates from certain staff and employees of Vagabond Inn Defendants and any management companies of the subject Vagabond Inn;

i. Vagabond Inn Corporation established detailed job descriptions for several positions in its Vagabond Inn properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. Vagabond Inn Corporation Defendant set requirements for the hiring process used by Vagabond Inn Defendants and oversaw employee discipline processes and termination decisions such that Vagabond Inn Corporation wanted to and did retain control over employment issues between Vagabond Inn Defendants and their employees and agents that ran the day to day operations at the subject Vagabond Inn;

k. Vagabond Inn Corporation provided benefits and perks for employees of Vagabond Inn Defendants and anyone that worked for the subject Vagabond Inn;

l. Vagabond Inn Corporation required Vagabond Inn Defendants to use a customer resource management program maintained and operated by the Vagabond Inn Corporation;

m. Vagabond Inn Corporation controlled channels for guests to report complaints or provide feedback regarding the subject Vagabond location and directly participated in the response and/or supervised

55

the response to customer complaints or other feedback. Vagabond Inn Corporation retained the right to provide refunds or other compensation to guests and to require Vagabond Inn Defendants to pay associated costs;

n. Vagabond Inn Corporation generated reports and analysis of guest complaints and online reviews for the subject Vagabond Inn location;

o. Vagabond Inn Corporation required Vagabond Inn Defendants and the subject Vagabond Inn to use a Guest Relations Application/software owned, operated, and maintained by Vagabond Inn Corporation to manage all guest data and information. Vagabond Inn Corporation could use the backend of this system to analyze data and generate reports;

p. Vagabond Inn Corporation set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if Vagabond Inn Corporation determines that the property has not purchased adequate insurance;

q. Vagabond Inn Corporation regularly audited the books and records of the subject Vagabond Inn Location;

r. Vagabond Inn Corporation Defendant conducted frequent and unscheduled inspections of Vagabond properties, including the subject Vagabond location;

s. Vagabond Inn Corporation retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of agreements if Vagabond Inn locations

violated any of its detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject Vagabond Inn;

t. Vagabond Inn Corporation controlled all marketing for the subject Vagabond Inn and prohibited it from maintaining any online presence unless specifically reviewed and approved by the Vagabond Inn Corporation, including but not limited to on all sites it was reviewed and reviewable;

u. Vagabond Inn Corporation imposed detailed recordkeeping and reporting requirements on Vagabond Inn Defendants and the subject Vagabond Inn regarding virtually all aspects of hotel operations;

v. Vagabond Inn Corporation supervised and controlled day-to-day operations of the Vagabond Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Vagabond Inn Defendants to use; and

w. Vagabond Inn Corporation defendant retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the subject Vagabond Inn.

x. Vagabond Inn Corporation required that the Vagabond Defendants provide certain amenities in very specific ways and monitored the day-to-day offerings, including free wi-fi, specific beds, on-site parking, group rates, credit cards that must be accepted, free breakfast, "best price guarantees," pet policies and booking and data technology;

y. Vagabond Inn Corporation flagged the subject Vagabond Inn, which means it put the property under the umbrella of its company and told the public that it was part of a recognized brand and entered into an agreement with the subject Vagabond Inn Defendants that it had control over the operations and that it must operate under the brand's standards, rules and guidelines.

**Vagabond Inn Corporation Knowingly Benefited from Participation in a Venture with Vagabond Inn Defendants and Plaintiff's Traffickers.**

236.    Hotel brands own properties and lend their name and likeness to third party owners, while the building and operations are under the brands' supervision and control. This is done through brand standards, franchise agreements, and maintaining control over all aspects of operations. This allows the parent brand to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a local property or franchise contract and still profit. Because of this, the hotel locations and parent brands—here the Vagabond Inn Corporation and Vagabond Inn Defendants; Red Roof Inns Inc. and Oceanic Fresno, L.P.; and Wyndham Hotel & Resorts, Inc. and Days Inn Owners, are inextricably intertwined.

237.    The average customer does not see this relationship. The parent brand gives the property its identity. The parent brand provides the signage that assures customers that if they check into that hotel, they can expect the standards consistent with the parent brand. The parent companies – Vagabond Inn Corporation, Red Roof Inns, Inc. and Wyndham Hotel & Resorts, Inc.—hold themselves out to the public as the owners of the property. These brand requirements are contractual with the power to control weighed heavily toward the corporate parent brand.

238.     At all times of trafficking alleged herein, bookings, advertising and room reservations for the subject Vagabond, Red Roof Inn, and Days Inn by Wyndham were controlled by the corporate parent brands.[15]

239.     Upon information and belief, at all times of trafficking alleged herein and currently, the Vagabond Inn locations typically pay a percentage of their total revenue back to the parent company, Vagabond Inn Corporation, and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

240.     Upon information and belief, per the franchise agreements, Vagabond Inn Corporation could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility.

241.     At all times of trafficking alleged herein, Vagabond Inn Corporation dictated policies related to safety, security, human trafficking, employee training and the Vagabond Inn Location's response to human trafficking and sex trafficking.

242.     Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by Vagabond Inn Corporation.

243.     Defendant Vagabond Inn Corporation profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring at the subject Vagabond Inn before and at that time.

244.     Defendant Vagabond Inn Corporation benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

---

[15] Meyer, Ellen, April 10, 2018. *The Origins and Growth of Franchising in the Hotel Industry.* Lodging Magazine.

245.    Defendant Vagabond Inn Corporation profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged and maintained for the purpose of sex trafficking.

246.    Defendant Vagabond Inn Corporation facilitated trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

247.    Vagabond Inn Defendants owned and operated the subject Vagabond Inn while sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time and usually for weeks at a time, for years, at the subject Vagabond Inn location but ignored it so they could profit.

248.    Plaintiff's trafficking at the subject Vagabond Inn location was a result of Vagabond Inn Corporation and the Vagabond Inn Defendants participating in a venture with each other and Plaintiff's criminal traffickers. If Vagabond Inn Corporation had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

249.    Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Vagabond Inn, Defendant Vagabond Inn Corporation participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further

violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

250.    Defendant Vagabond Inn Corporation financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions.

251.    Defendant Vagabond Inn Corporation participated in this venture through the conduct described herein as they were jointly responsible for or had complete control over the specific hotel operations at the subject Vagabond Inn location.

## Oceanic Fresno, L.P. and Red Roof Inns, Inc. Knew About and Participated in the Trafficking of Plaintiff and Others at the Red Roof Inn

252.    Oceanic Fresno, L.P. and Red Roof Inns, Inc. have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and the subject Red Roof Inn.

253.    The subject Red Roof Inn, located at 4141 N. Blackstone Avenue in Fresno, California was previously an America's Best Value Inn that was known to the community as a prostitution and crime hub for several years.  Red Roof Inn then inspected the area, became aware that it was a prostitution and sex crimes hub and chose to enter into a franchise agreement to participate in and benefit from the criminal activity in that area and place its flag on it to bring it under its company umbrella.  From about late 2013 to mid-2016 while Plaintiff was trafficked there, it was a "Red Roof Inn" and owned by Oceanic Fresno, L.P. and operated, managed, supervised, flagged, branded, advertised and controlled by Red Roof Inns, Inc.

254.    Before and at all relevant times, the Oceanic Fresno, L.P. and Red Roof Inns, Inc. knew that the Red Roof Inn was used for sex trafficking.

255.    The Red Roof Inns, Inc. owns, operates and controls one of the largest budget hotel chains in the United States.  More recently, it has franchised more and more properties in attempt to avoid liability associated but it has not given up the

control over the properties, including at all relevant times, the subject Red Roof Inn. It knew and knows details about each property and was and is involved in the day-to-day operations at each property, including the crime that takes place at each and including the subject Red Roof Inn from 2013 to 2016.

256.    Based upon information and belief, the Red Roof Inns, Inc. franchised the subject Red Roof Inn to the Oceanic Fresno, L.P. before Plaintiff was trafficked there knowing that the property was already a cesspool for crime and criminal activity, including prostitution and sex trafficking. Red Roof Inns, Inc. conducts detailed inspections of property and areas before entering into franchise agreements and did the same here. At all relevant times, the subject high-crime area and property would have been readily apparent upon reasonable inspection.

257.    Upon information and belief, Red Roof Inns, Inc. conducts research and chooses what locations to enter into franchise locations with and knew before agreeing to franchise and operate the subject Red Roof Inn that it was in a location and on property that was known for sex trafficking, sex crimes and other criminal activity that had resulted in several raids and arrests.

258.    Red Roof Inns, Inc. holds itself out to the public as the operator of the Red Roof Inns that it franchises, including the subject Red Roof Inn, and has made public statements about it being the operator of its franchised properties. It advertises each property and provides details and misrepresentations about safety to the public in attempt to entice the public to rent rooms at the properties.

259.    Based upon information and belief, at all relevant times, the Oceanic Fresno, L.P. and Red Roof Inns, Inc. had a written agreement that gave the Red Roof Inn control over the subject Red Roof Inn and Oceanic Fresno, L.P. as it relates to booking and payment policies, safety and reports related to safety concerns, crime at the property, and to inspect the property and to make any changes necessary for the safety of guests at the property.

260.    Based upon information and belief, the subject Red Roof Inn employees and Oceanic Fresno, L.P. reported to the Red Roof Inns, Inc. about any and all criminal activity, including from 2013 to 2016, and it was known to the Red Roof Inns, Inc. that criminal activity was ramped at the subject Red Roof Inn, that commercial sex was taking place daily and nightly and that people were forcing women and girls to engage in commercial sex by use of physical force, threats and coercion at the subject Red Roof Inn during that time.

261.    From 2013 to 2016, as well as before and after, Oceanic Fresno, L.P. spoke to police officers regularly who responded to calls from guests and the public related to crime, including rape, prostitution, domestic violence, assault and battery, death and other crimes arising out of sex trafficking, including sex trafficking itself.  During relevant times, the VICE unit responded to the subject Red Roof Inn on multiple occasions related to sex trafficking. Oceanic Fresno, L.P. were directly made aware of the sex trafficking from law enforcement, traffickers, and other guests and victims.

262.    Based upon information and belief, Red Roof Inns, Inc. was made aware of the police activity, response to sex crimes including sex trafficking, and police reports from Oceanic Fresno, L.P. and by and through their own audits, investigations and inspections of the subject Red Roof Inn.

263.    Based upon information and belief, Red Roof Inns, Inc. conducted regular inspections of the subject Red Roof Inn during the time Plaintiff was trafficked there and directly witnessed sex trafficking red flags, including solicitation, women being forced to stand around the motel and solicit sex, traffickers standing around the motel with weapons watching, money exchanges, men going in and out of rooms that were not guests, bruised and battered women, women and minor girls dressed in provocative clothing being ushered around by traffickers, drug activity, and other crime.

264.     Based upon information and belief, the Red Roof Inns, Inc. has an ownership interest in and/or owns several other Red Roof Inn motels and other hotels that have participated in sex trafficking ventures and where VICE units and other police departments have made several arrests and found adult and minor victims being trafficked for sex.

265.     Based upon information and belief, over forty (40) federal lawsuits have been filed against Red Roof Inns, Inc. and hundreds of sex trafficking victims have more recently came forward against Red Roof Inns, Inc. describing similar stories how they were blatantly and openly trafficked for sex and abused and harbored at Red Roof Inns, which includes but is not limited to the subject Red Roof Inn.

266.     From 2013 to 2016, Red Roof Inns, Inc. had access to and did review, intercept and read online reviews for its properties that it owns and/or operates as franchisors, including the subject Red Roof Inn. Reviews from most of the Red Roof Inn locations that Red Roof Inns, Inc. has a franchise and ownership interest in put the Red Roof Inns, Inc. on direct notice that prostitution and sex trafficking has been occurring at most of its locations for over a decade.

267.     Based upon information and belief, Red Roof Inns, Inc. obtained all reviews for the branded properties it operated, including the subject Red Roof Inn and analyzed the reviews as part of a data report.  Red Roof Inns, Inc. retained control over the subject Red Roof Inns, Inc. response to reviews and reports of criminal activity, including sex trafficking.

268.     Oceanic Fresno, L.P. and Red Roof Inns, Inc. were and are well aware of the sex trafficking signs and red flags, as well as the fact that it has occurred at hotels and motels for decades and have chosen to allow it to happen at their properties, including the subject Red Roof Inn from 2013 to 2016, despite that knowledge.

269.     The subject hotel that became a Red Roof Inn in Fresno in 2013 has been a known hotspot and cesspool for sex crimes and other heinous crimes since before 2007.

270.     Oceanic Fresno, L.P. saw and heard sex trafficking occurring at the subject Red Roof Inn located at or about 4141 N. Blackstone Avenue in Fresno California from 2013 to 2016, including the trafficking of Plaintiff there.  Oceanic Fresno, L.P. communicated with Plaintiff's traffickers and Red Roof Inns, Inc. about the trafficking of victims, including Plaintiff.  They referred to the victims as "hoes." Oceanic Fresno, L.P. knew the traffickers and knew that the traffickers controlled Plaintiff and it was clear that Plaintiff's traffickers were watching Plaintiff at all times and forcing her to engage in commercial sex.  Oceanic Fresno, L.P. understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Red Roof Inn and the traffickers' profits, including Oceanic Fresno, L.P.'s and Red Roof Inns, Inc.'s profits.

271.     Red Roof Inns, Inc. inspected the property from 2013 to 2016 and saw the red flags of Plaintiff's trafficking and knew or should have known that it was profiting and benefiting from the room rentals that directly resulted from the trafficking of Plaintiff and other sex trafficking victims at the subject Red Roof Inn.

272.     Upon information and belief, before and at the time Plaintiff was trafficked at the subject Red Roof Inn, Oceanic Fresno, L.P. and Red Roof Inns, Inc. saw victims, including but not limited to Plaintiff, being held captive, controlled, drugged, abused, hit and trafficked for sex there.  Oceanic Fresno, L.P., Red Roof Inns, Inc., and/or their employees while working in the course and scope of their employment with each, directly witnessed all signs of sex trafficking, including the signs of the trafficking of Plaintiff described above.

273.     The police responded to 911 calls from outsiders and guests at the subject Red Roof Inn property regularly and approximately more than nine hundred (900) times from 2013 to 2016 for criminal activity, including crimes related to sex trafficking, prostitution, rape, domestic violence, assault and battery, deaths, criminals with warrants, fights and serious bodily injuries requiring emergent medical attention.

274.     Oceanic Fresno, L.P. and Red Roof Inns, Inc. were made aware of those crimes and sex crime incidents during the subject times that Plaintiff was regularly trafficked there for sex, by and through law enforcement and the public, and did not do anything to try to prevent the sex crimes, including sex trafficking, from continuing to occur at the property from 2013 to 2016.

275.     Since at least 2013, Oceanic Fresno, L.P. and Red Roof Inns, Inc. knew employees and staff at its properties, including the subject Red Roof Inn, were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs;" not requiring parking passes; not having gated parking lots; allowing daily payments of cash for extended stays; complying with requests for specific rooms; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms without IDs where victims were trafficked; allowing guests to use illicit drugs on property; allowing violence to occur at the property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place; ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that

entail known signs of trafficking and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property.

276.     Reviews for the subject Red Roof Inn left on public online sites that were routed directly to Red Roof Inns, Inc. and Oceanic Fresno, L.P. show that guests reported prostitutes and "hoes" all around the property; it seems "to be a homeless hostel;" hypodermic needles were on the ground; women were in rooms that were supposed to be unoccupied; it was "an insult to the ghetto;" prostitutes in the parking lot; groups of sketchy people hanging out in the parking lot screaming and being loud all night; the "place is ghetto" and filled with "a lot of locals;" "shady people outside the rooms;" guests yelling, screaming and fighting all night and the motel did not call the police; "tweakers are outside banging loud;" "locals go there to drug up for the night;" "I was offered 'work' form the local complex drug dealer;" "public displays of drug use;" "visitors doing drugs in the hallway;" "unless you sell yourself, sell drugs, or collect social security check for a living;" "they have people that live there;" "there also was a major fight out front...with blood everywhere;" "they said a murder and two death the last few months;" "I saw the coroner's van there;" "people who don't belong in the building will loiter outside a door to get in when a guest enters;" "we have seen hookers and a drug deal and a man and woman fighting and screaming across from our room;" and "no place for a woman."

277.     Oceanic Fresno, L.P. and Red Roof Inns, Inc. have direct access to, read and respond to reviews left by guests on websites wherein guests frequently complain about the prevalence of sketchy people, prostitution, hookers, drugs and drug use and dealing, unhealthy conditions, unsafe conditions, blood in rooms and on property, criminals living at property, and other signs of trafficking at the subject Red Roof Inn.  Oceanic Fresno, L.P. and Red Roof Inns, Inc. read online

reviews, so they saw the reviews that put them on notice or should have put them on notice of trafficking occurring at the subject Red Roof Inn from 2013 to 2016.

278. Oceanic Fresno, L.P. and Red Roof Inns, Inc. provided the means necessary for traffickers to traffic victims, including Plaintiff.

279. At all relevant times, Oceanic Fresno, L.P. and Red Roof Inns, Inc. arranged with traffickers to have victims housed in specific areas and rooms within the subject Red Roof Inn, so they were segregated from legitimate customers.

280. At all relevant times, Oceanic Fresno, L.P. and Red Roof Inns, Inc. allowed traffickers to use other people's identification or did not require any form of identification, knowing illegal activity that would occur, and understanding that sometimes payment would not be made until after the forced commercial sex acts.

281. Oceanic Fresno, L.P. and Red Roof Inns, Inc. often charged higher room rates to traffickers in exchange for permitting trafficking activities to be conducted at the subject Red Roof Inn and accommodating late, cash payments.

282. Oceanic Fresno, L.P.'s employees often participated and engaged in trafficking activities at the subject Red Roof Inn.

283. Red Roof Inns, Inc. knew or should have known about the Oceanic Fresno, L.P.'s employees' participation and engagement in trafficking activities at the subject Red Roof Inn because it was readily apparent upon any reasonable inspection from 2013 to 2016.

284. The subject Red Roof Inn had malnourished, underage and adult women under the control of traffickers/pimps who openly conducted their trafficking business in front of Red Rood Inn's employees and/or management and the traffickers rented numerous hotel rooms for the buyers to come and go night after night. Red Roof Inns, Inc. and Oceanic Fresno, L.P. would have easily seen this regular, open activity upon any reasonable inspection of the property and did see it.

285.    Based upon information and belief, the subject Red Roof Inn has had other sex trafficking survivors speak out against it related to its owners, operators and franchisors allowing and participating in the open and blatant sex trafficking that took place at the subject Red Roof Inn during the same years alleged herein.

286.    During the period Plaintiff was trafficked at the subject Red Roof Inn, obvious signs existed and were visible to anyone paying attention that her traffickers were engaged in sex trafficking.

287.    Other women and girls were trafficked by other traffickers at the same Red Roof Inn at the same time as Plaintiff and Oceanic Fresno, L.P. and Red Roof Inns, Inc. saw and heard the signs and should have saw and heard the signs of that sex trafficking too.

288.    Other women and girls were trafficked by Plaintiff's traffickers at the same Red Roof Inn and at the same time as Plaintiff.  Oceanic Fresno, L.P. and Red Roof Inns, Inc. knew traffickers were controlling women and girls at the subject Red Roof Inn and forcing the women and girls to have sex there but Oceanic Fresno, L.P. and Red Roof Inns, Inc. only cared about getting money for rooms and chose not to intervene or do anything to stop the known trafficking and other crimes occurring at the property.

289.    Defendant Red Roof Inns, Inc.'s and Oceanic Fresno, L.P.'s agents and employees were physically at the subject Red Roof Inn often from 2013 to 2016 while Plaintiff was being trafficked there.  Based upon information and belief, the subject defendants' employees and agents were aware of all operations and criminal activity because they had employees that were engaged in such activity and regular guests that lived at the property for long periods of time that were also engaged in the criminal activities daily and nightly. The Red Roof Inn defendants, by and through their employees and agents, inspected the property, conducted audits and

were running major and day-to-day operations of the subject Red Roof Inn such that they knew about the sex trafficking firsthand and by and through their employees.

290.    At all relevant times, Plaintiff's traffickers would get the rooms, did not appear to have to show any form of ID to the Red Roof Inn,  Oceanic Fresno, L.P. or their employees, were allowed to pay in cash nightly and would linger around the hotel or in the parking lot throughout the nights while Plaintiff was forced to have sex with non-guest buyers at the subject Red Roof Inn multiple times per day for weeks. This was all in plain sight of Oceanic Fresno, L.P. daily and nightly, Red Roof Inns, Inc. during inspections, and to both by and through their employees and agents. Plaintiff's traffickers could be seen leaving the room when another male arrived and then returning as soon as that male left. This would happen multiple times a day/night, every day that Plaintiff was trafficked there for weeks at a time, for years. Employees and traffickers worked together to encourage buyers to participate and make it easy for sellers and buyers to conduct business on the property for profits.  Oceanic Fresno, L.P. and Red Roof Inns, Inc. made an active choice not to call the police or notify law enforcement about the trafficking that they knew was going on at the subject Red Roof Inn for years, including the trafficking of Plaintiff, so that they would continue to profit from the sex trafficking ventures.

291.    Heavy foot traffic took place in and out of the rooms where Plaintiff and other victims were being harbored at the subject Red Roof Inn. This foot traffic involved men who were not hotel guests and did not show identification to the hotel or require parking passes to park. Several men came in and out of the subject hotel rooms and on and off the property in a single day. These individuals entered the room Plaintiff and other victims were in, and left at unusual hours and were present at the hotel or in the room for brief periods of time. Their comings and goings were visible to hotel employees and the employees of Oceanic Fresno, L.P.

and Red Roof Inns, Inc. that were located at the front desk and around the property. Some employees and guests appeared to live at the Red Roof Inn and were always around. A reasonable hotel/motel company would have seen these regular "red flag" interactions at their property in plain sight and Red Roof Inn Defendants should have seen it themselves while at the property, as well as by and through their employees and agents who were at the property and also observed all of the signs of Plaintiff's trafficking.

292.    Oceanic Fresno, L.P. and Red Roof Inns, Inc. allowed, facilitated, and participated in the trafficking. Oceanic Fresno, L.P. and Red Roof Inns, Inc. could easily see what was going on because it was happening constantly and in plain view of them and their employees and agents.

293.    Plaintiff would have been seen by Oceanic Fresno, L.P.' and Red Roof Inns, Inc.'s employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy. Other victims, including minor victims, of Plaintiff's traffickers would have been visible to the employees and agents too.

294.    There were obvious signs of Plaintiff's trafficking visible to Oceanic Fresno, L.P. and Red Roof Inns, Inc. that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, abuse, control, condoms, sex paraphernalia, lingerie, loitering, drug use and selling, and solicitation. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, inspecting the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

295.    When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was

visible to hotel employees that she passed by regularly at the subject Red Roof Inn for years.

296.     Upon information and belief, multiple employees of each Defendant, including the Oceanic Fresno, L.P. and Red Roof Inns, Inc., and including management-level employees, observed, or were made aware of the obvious signs of Plaintiff's trafficking while acting within the course and scope of their employment with each applicable defendant.

297.     Based upon information and belief, Oceanic Fresno, L.P. and Red Roof Inns, Inc. read all online reviews about the subject Red Roof Inn property while each owned, had an ownership interest in, operated and/or controlled it.  Numerous reviews were left online about the Red Roof Inn that directly put defendants on notice of red flags of sex trafficking, including from 2013 to 2016.

298.     As such, Oceanic Fresno, L.P. and Red Roof Inns, Inc. knew and should have known that Plaintiff was being trafficked at the subject Red Roof Inn regularly from 2013 to 2016.

299.     At all times relevant, from 2013 to 2016, Oceanic Fresno, L.P. and Red Roof Inns, Inc. knowingly profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers related to her trafficking and the trafficking of others.

**Red Roof Inns, Inc. Exercised Control Over the Subject Red Roof Inn and the Oceanic Fresno, L.P.**

300.     Oceanic Fresno, L.P. owned the Red Roof Inn located at 4141 N. Blackstone Avenue in Fresno, California during the time Plaintiff was trafficked.

301.     Red Roof Inns, Inc. is vicariously liable for the acts, omissions, and knowledge of the Red Roof Inn employees and staff of the subject Red Roof Inn,

including Oceanic Fresno, L.P., because the employees and staff were Defendants'
actual agents or subagents.

302.    Upon information and belief, it is a standard practice in the hospitality
industry, followed by Defendant Red Roof Inns, Inc., for parent companies to set
exacting brand quality standards, rules and to retain control over day to day
operations, including things like the temperature at which coffee shall be served,
room rates, documentation to be kept, how to handle crime, how to report crime,
policies and procedures for staff to follow in response to suspected criminal activity,
policies and procedures related to staff and employees engaging in criminal activity,
employee and agent training, and to the number of pillows that are placed on the
beds, to the types of payments accepted, to when, where, and how guests are
greeted.

303.    Red Roof Inns, Inc. Defendant provides their Red Roof Inn locations
with signage on and in front of the buildings and throughout the properties. This is
done to assure customers that when they check in, they can expect an experience
consistent with the standards of the Parent Hotel Brand, including the public
statements and promises Red Roof Inns, Inc. makes to the public about safety and
comfort. This brand logo is usually displayed on everything in the hotel, such as
pens and paper on the bedside table and staff uniforms worn at the front desk
during check-in.

304.    Red Roof Inns, Inc. provides their hotels branded locations brand name
recognition, a marketing campaign, hotel listings, advertising, and participation in
online hotel databases. They also provide access to their brand-wide central
reservation systems, 800 numbers, revenue management tools, brand programs,
training programs, audits, financial tools and company websites. Therefore,

bookings and room reservations are primarily controlled by Parent Hotel Defendants.[16]

305.    Red Roof Inns, Inc. subjects and at all relevant times subjected their hotel locations, including the subject Red Roof Inn, to detailed standards and requirements regarding the operation of the subject Red Roof Inn through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the Red Roof Inns, Inc. parent hotel defendant.

306.    Upon information and belief, at all relevant times, Red Roof Inns, Inc. required its branded hotel properties, including the Oceanic Fresno, L.P. named herein, to use a property management system that is linked to Red Roof Inns, Inc.'s corporate network and data center. This is to, among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

307.    Upon information and belief, per the relevant agreements, Red Roof Inns, Inc. may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject Red Roof Inn during the subject time period, backed up with the ultimate threat of and ability to terminate the agreement and operations.[17]

**Red Roof Inn and Oceanic Fresno, L.P. Employees and Staff Acted as Actual Agents of Defendant Red Roof Inns, Inc.**

308.    Red Roof Inns, Inc. is vicariously liable for the acts, omissions, and knowledge of their employees, agents and staff of the subject Red Roof Inn location described herein, which are Red Roof Inns, Inc.'s actual agents or subagents.

---

[16] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).
[17] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

309.     Oceanic Fresno, L.P. and Red Roof Inns, Inc. subjected Red Roof Inn employees and agents to detailed training, standards and requirements regarding the operation of the Red Roof Inn location named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by Red Roof Inns, Inc.—and the Corporation retained the right to enforce its training, policies, rules and standards.

310.     Upon information and belief, the standards that Defendant Red Roof Inns, Inc. imposed and imposes on their branded properties at all relevant times included but were not limited to the following:

a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Red Roof Inn Fresno used at its Fresno location;

b.  Covered virtually all aspects of hotel operations, including internal operating functions;

c.  Dictated the specific manner in which Oceanic Fresno, L.P. and the subject Red Rood Inn and hotel staff must carry out most day-to-day functions at the Red Roof Inn Fresno; and

d.  Significantly exceeded what was necessary for Red Roof Inns, Inc. to protect its registered trademarks.

311.     In addition to the methods described above, upon information and belief, Red Roof Inns, Inc. Defendant exercised and reserved the right to exercise systemic and pervasive control over Oceanic Fresno, L.P.'s and the subject Red Roof Inn's day-to-day operation of the subject Red Roof Inn location during relevant times, including in the following ways:

a.  Defendant Red Roof Inns, Inc. required Oceanic Fresno, L.P. and management of the hotel to participate in training programs, both

during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Red Roof Inns, Inc. to protect its registered trademarks;

b. Defendant Red Roof Inns, Inc. provided training for hotel management and select hotel staff on-site at the Red Roof Inn location and Red Roof Inns, Inc. went to the Red Roof Inn location;

c. Red Roof Inns, Inc. required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. Red Roof Inns, Inc. controlled training provided by Oceanic Fresno, L.P. to hotel staff by dictating the content of that training, especially related to human trafficking, providing required content for that training, and dictating the training methods used;

e. Red Roof Inns, Inc. retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Red Roof Inn Fresno was required to purchase to operate the Red Roof Inn location, Red Roof Inns, Inc. designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor such that it had to sign off or give permission;

g. Red Roof Inns, Inc. required the Oceanic Fresno, L.P. to sign technology, software, and data agreements governing the terms under which it must procure, store, share and use technical services, software and data related to the subject Red Roof Inn. Oceanic Fresno, L.P. were required to install, and use certain brands, types, make, and/or models of hardware, software,

peripheral equipment, data storage, data sharing devices and software and support services to perform internal operating functions at the subject Red Roof Inn;

h. Red Roof Inns, Inc. consistently communicated with, directed, instructed, and got updates from certain staff and employees of Oceanic Fresno, L.P. and any management companies of the subject Red Roof Inn;

i. Red Roof Inns, Inc. established detailed job descriptions for several positions in its Red Roof Inn properties, including the subject Red Roof Inn, and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. Red Roof Inns, Inc. Defendant set requirements for the hiring process used by Oceanic Fresno, L.P., property management companies, and oversaw employee discipline processes and termination decisions such that Red Roof Inns, Inc. wanted to and did retain control over employment issues between Oceanic Fresno, L.P. and their employees and agents that ran the day-to-day operations at the subject Red Roof Inn;

k. Red Roof Inns, Inc. provided benefits and perks for employees of Oceanic Fresno, L.P. and anyone that worked for the subject Red Roof Inn;

l. Red Roof Inns, Inc. required Oceanic Fresno, L.P. to use a customer resource management program maintained and operated by the Red Roof Inns, Inc.;

m. Red Roof Inns, Inc. controlled channels for guests to report complaints or provide feedback regarding the subject Red Roof Inn

location and directly participated in the response and/or supervised the response to customer complaints or other feedback. Red Roof Inns, Inc. retained the right to provide refunds or other compensation to guests and to require Oceanic Fresno, L.P. or other Red Roof Inn employees to pay associated costs;

n. Red Roof Inns, Inc. generated reports and analysis of guest complaints and online reviews for the subject Red Roof Inn location;

o. Red Roof Inns, Inc. required Oceanic Fresno, L.P. and the subject Red Roof Inn to use a Guest Relations Application/software owned, operated, and maintained by Red Roof Inns, Inc. to manage all guest data and information. Red Roof Inns, Inc. could use the backend of this system to analyze data and generate reports;

p. Red Roof Inns, Inc. set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if Red Roof Inns, Inc. determines that the property has not purchased adequate insurance;

q. Red Roof Inns, Inc. regularly audited the books and records of the subject Red Roof Inn Location;

r. Red Roof Inns, Inc. Defendant conducted frequent and unscheduled inspections of Red Roof Inn properties, including the subject Red Roof Inn location;

s. Red Roof Inns, Inc. retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of agreements if Red Roof Inn locations violated any of its detailed rules, expectations, protocols, or policies,

including those that governed day-to-day operations of the subject Red Roof Inn;

t. Red Roof Inns, Inc. controlled all marketing for the subject Red Roof Inn and prohibited it from maintaining any online presence unless specifically reviewed and approved by the Red Roof Inns, Inc., including but not limited to on all sites it was reviewed and reviewable;

u. Red Roof Inns, Inc. imposed detailed recordkeeping and reporting requirements on Oceanic Fresno, L.P. and the subject Red Roof Inn regarding virtually all aspects of hotel operations;

v. Red Roof Inns, Inc. supervised and controlled day-to-day operations of the Red Roof Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Oceanic Fresno, L.P. to use; and

w. Red Roof Inns, Inc. retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the subject Red Roof Inn.

x. Red Roof Inns, Inc. required that Oceanic Fresno, L.P. provide certain amenities in very specific ways and monitored the day-to-day offerings, including wi-fi, housekeeping, security, on-site parking, group rates, credit cards, online bookings, payment options that must be accepted, free breakfast, "best price guarantees," and booking and data technology;

y. Red Roof Inns, Inc. flagged the subject Red Roof Inn, which means it put the property under the umbrella of its company and told the public that it was part of a recognized brand and entered into an

agreement with the Oceanic Fresno, L.P. that mandated Red Roof Inns, Inc. had control over the operations and that it must operate under the brand's standards, rules and guidelines.

**Red Roof Inns, Inc. Knowingly Benefited from Participation in a Venture with Oceanic Fresno, L.P., the Subject Red Roof Inn and Plaintiff's Traffickers.**

312.     Red Roof Inns, Inc. and Oceanic Fresno, L.P. are inextricably intertwined.

313.     Upon information and belief, at all times of trafficking alleged herein and currently, the Red Roof Inn locations typically pay a percentage of their total revenue back to the parent company, Red Roof Inns, Inc., and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

314.     Upon information and belief, per the franchise agreements, Red Roof Inns, Inc., could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility.

315.     At all times of trafficking alleged herein, Red Roof Inns, Inc. dictated policies related to safety, security, human trafficking, employee training and the subject Red Roof Inn Location's response to human trafficking and sex trafficking.

316.     Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Red Roof Inn passed through a system operated and managed by Red Roof Inns, Inc.

317.     Defendant Red Roof Inns, Inc. profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew

or should have known that human trafficking was occurring at the subject Red Roof Inn before and at that time, and specifically that she was being trafficked.

318.    Defendant Red Roof Inns, Inc. benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

319.    Defendant Red Roof Inns, Inc. profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged and maintained for the purpose of sex trafficking.

320.    Defendant Red Roof Inns, Inc. facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

321.    Oceanic Fresno, L.P. owned and operated the subject Red Roof Inn while sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for weeks at a time, for years, at the subject Red Roof Inn location but ignored it so they could profit.

322.    Plaintiff's trafficking at the subject Red Roof Inn location was a result of Red Roof Inns, Inc. and the Oceanic Fresno, L.P. participating in a venture with each other and Plaintiff's criminal traffickers. If Red Roof Inns, Inc. had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

323.    Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Red Roof Inn,

Defendant Red Roof Inns, Inc. participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

324.    Defendant Red Roof Inns, Inc. financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions.

325.    Defendant Red Roof Inns, Inc. participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Red Roof Inn location.

**Days Inn Owners and Wyndham Hotel & Resorts, Inc. Knew About and Participated in the Trafficking of Plaintiff and Others at the Days Inn**

326.    Days Inn Owners—Thandi Enterprises, L.L.C., Cal Tex Hospitality, L.L.C., and Metro Hospitality Services, Inc—and Wyndham Hotel & Resorts, Inc. have known, since well before Plaintiff was trafficked, that sex trafficking was ongoing and widespread at their specific locations and the subject Days Inn.

327.    The subject Days Inn, located at 2640 2nd Street in Fresno, California was known as a sex trafficking hub for years before Plaintiff was trafficked there. The subject Days Inn is right off of Highway 99 and minute or two away from Parkway Drive or "Motel Drive"—a known high-crime string of hotels and motels that the City, County and State had been trying to clean up and remedy for years before and during Plaintiff's trafficking. Days Inn Owners and Wyndham knew the area of the subject Days Inn was known for prostitution and sex trafficking and knowingly chose to enter into a franchise agreement to participate in and benefit from the sex trafficking in that area. Wyndham flagged the property and decided to franchise it to bring it under its company umbrella back in the early 2000s or before. The property and Days Inn had been owned by the same individuals

running various companies since the early 2000s. The Days Inn Owners and the subject Days Inn were operated, managed, supervised, flagged, branded, advertised and controlled by Wyndham Hotel & Resorts, Inc. for years before Plaintiff was trafficked there and they all knew that prostitution, sex trafficking, sex crimes and other criminal activities were occurring there regularly for years before and during the time Plaintiff was trafficked there.

328.   Before and at all relevant times, the Days Inn Owners and Wyndham Hotel & Resorts, Inc. knew that Days Inn properties, including the subject Days Inn, were used for sex trafficking.

329.   Wyndham claims it is "the world's largest and most diverse hotel company, encompassing more than 8,400 hotels across 24 brands in 95 countries." It boasts about its twenty-five (25) brands—all of which it created, controlled, and sells to the public by and through its franchisees.

330.   Wyndham owns several brands, including Days Inn®, and controls markets, brands, and holds itself out as the owner and controller of, each. It has numerous hotels in the State of California currently that it profits from. It has a rewards program and credit card with points through which it sends people to its branded properties, including Days Inn and at all times relevant, the subject Days Inn. It allows the public, including traffickers, to book rooms at its branded properties through its website and provides offers and deals online for its properties, including the subject Days Inn at all times relevant.

331.   Wyndham and Days Inn Owners defendants are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Days Inn property where Plaintiff JANE DOE was trafficked for sex. Wyndham and Days Inn Owners each share the common policies and practices complained of herein.

332.    The Wyndham Hotel & Resorts, Inc. owns, operates and controls one of the largest budget hotel chains in the United States.  More recently, it has franchised more and more properties in attempt to avoid liability associated but it has not given up the control over the properties, including at all relevant times, the subject Days Inn. It knew and knows details about each property and was and is involved in the day-to-day operations at each property, including the crime that takes place at each and including the subject Days Inn from 2010 to 2016.

333.    Wyndham represents to the public that Days Inn by Wyndham properties have consistently doubled room openings year after year.  It's clear that Wyndam is concerned with profit and not people or people's safety.  Upon information and belief, at all times of trafficking alleged herein and currently, the Days Inn Owner Defendants pays Wyndham a significant percent of their total revenue and is required to develop, operate and maintain the property in accordance with the parent Wyndham's brand standards as they are laid out in the franchise agreement and other agreements.

334.    Based upon information and belief, the Wyndham Hotel & Resorts, Inc. franchised the subject Days Inn to the Days Inn Owners before Plaintiff was trafficked there knowing that the property was already a cesspool for crime and criminal activity, including prostitution and sex trafficking.  Wyndham Hotel & Resorts, Inc. conducts detailed inspections of property and areas before entering into franchise agreements and did the same here.  At all relevant times, the subject high-crime area and property would have been readily apparent upon reasonable inspection.

335.    Upon information and belief, Wyndham Hotel & Resorts, Inc. conducts research and chooses what locations to enter into franchise agreements with and knew before agreeing to franchise and operate the subject Days Inn that it was in a

location and on property that was known for sex trafficking, sex crimes and other criminal activity that had resulted in several raids and arrests.

336.    Wyndham Hotel & Resorts, Inc. holds itself out to the public as the operator of the Days Inn's that it franchises, including the subject Days Inn, and has made public statements about it being the operator of its franchised properties. It advertises each property and provides details and misrepresentations about safety to the public in attempt to entice the public to rent rooms at the properties.

337.    Based upon information and belief, at all relevant times, the Days Inn Owners and Wyndham Hotel & Resorts, Inc. had a written agreement that gave the Days Inn control over the subject Days Inn and Days Inn Owners as it relates to booking and payment policies, safety and reports related to safety concerns, crime at the property, and to inspect the property and to make any changes necessary for the safety of guests at the property.

338.    Based upon information and belief, the subject Days Inn employees and Days Inn Owners reported to the Wyndham Hotel & Resorts, Inc. about any and all criminal activity, including from 2010 to 2016, and it was known to the Wyndham Hotel & Resorts, Inc. that criminal activity was ramped at the subject Days Inn, that commercial sex was taking place daily and nightly and that people were forcing women and girls to engage in commercial sex by use of physical force, threats and coercion at the subject Days Inn during that time.

339.    From 2010 to 2016, as well as before and after, Days Inn Owners spoke to police officers regularly who responded to calls from guests and the public related to crime, including rape, prostitution, domestic violence, assault and battery, death and other crimes arising out of sex trafficking, including sex trafficking itself. During relevant times, the VICE unit responded to the subject Days Inn on multiple occasions related to sex trafficking. Days Inn Owners were directly made aware of the sex trafficking from law enforcement, traffickers, and other guests and victims.

340.     Based upon information and belief, Wyndham Hotel & Resorts, Inc. was made aware of the police activity, response to sex crimes including sex trafficking, and police reports from Days Inn Owners and by and through their own audits, investigations and inspections of the subject Days Inn.

341.     Wyndham also has put out several public statements over the past ten (10) to fifteen (15) years indicating they know that sex trafficking is a problem in the hotel industry and at their hotels and claiming that they will be committed to fight against it.

342.     Defendant Wyndham signed "the Code" several years ago before Plaintiff was trafficked and thereby promised to adopt policies to combat trafficking.[18] Yet, Defendants have failed to implement most, if not all of these policies.

343.     Defendant Wyndham is a face and signor of the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective mandatory Brand standards to be mandated at its branded properties, but it should also have enforced them.  Despite Wyndham's direct and vicarious knowledge of trafficking at its hotel, it did not create, implement or enforce effective standards to prevent the trafficking it knew its properties were facilitating, including at the subject Days Inn.

344.     Based upon information and belief, Wyndham Hotel & Resorts, Inc. conducted regular inspections of the subject Days Inn during the time Plaintiff was trafficked there and directly witnessed sex trafficking red flags, including

---

[18] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

solicitation, women being forced to stand around the motel and solicit sex, traffickers standing around the motel with weapons watching, money exchanges, men going in and out of rooms that were not guests, bruised and battered women, women and minor girls dressed in provocative clothing being ushered around by traffickers, drug activity, and other crime.

345.    Based upon information and belief, the Wyndham Hotel & Resorts, Inc. has an ownership interest in and/or owns several other Days Inn motels and other hotels that have participated in sex trafficking ventures and where VICE units and other police departments have made several arrests and found adult and minor victims being trafficked for sex.

346.    Based upon information and belief, several federal lawsuits have been filed against Wyndham Hotel & Resorts, Inc. and hundreds of sex trafficking victims have come forward against Wyndham Hotel & Resorts, Inc. describing similar stories about how they were blatantly and openly trafficked for sex and abused and harbored at Wyndham properties.

347.    From 2010 to 2016, Wyndham Hotel & Resorts, Inc. had access to and did review, intercept, and read online reviews for its properties that it owns and/or operates as franchisors, including the subject Days Inn. Reviews from most of the Days Inn locations that Wyndham Hotel & Resorts, Inc. has a franchise and ownership interest in put the Wyndham Hotel & Resorts, Inc. on direct notice that prostitution and sex trafficking has been occurring at most of its locations for over a decade.

348.    Wyndham has published reports indicating that it controls and implements anti-trafficking policies at its branded hotels and its website directs consumers to information regarding the same.

349.    Despite reports, police activity and investigation of trafficking at the subject Days Inn, and direct knowledge of trafficking at the subject Days Inn,

Wyndham did not change its ways or policies and procedures no matter how many people it hurt over the years.

350.    Wyndam claims in a recent public report that it "continues to work to enhance policies and mandate training for all team members to help them identify and report suspected trafficking activities." Thus, it knows sex trafficking is a problem at its properties and its other public statements shows it knows it has been for years.

351.    Based upon information and belief, Wyndham Hotel & Resorts, Inc. obtained all reviews for the branded properties it operated, including the subject Days Inn and analyzed the reviews as part of a data report. Wyndham retained control over the subject Days Inn's response to reviews and reports of criminal activity, including sex trafficking.

352.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out Red Roof Inns, Inc. and Wyndham branded properties owned and/or controlled by Red Roof Inns, Inc. or Wyndham.

353.    Days Inn Owners and Wyndham Hotel & Resorts, Inc. were and are well aware of the sex trafficking signs and red flags, as well as the fact that it has occurred at hotels and motels for decades and have chosen to allow it to happen at their properties, including the subject Days Inn from 2010 to 2016, despite that knowledge.

354.    The subject hotel that became a Days Inn in Fresno in or before the early 2000s has been a known hotspot and cesspool for sex crimes and other heinous crimes since before Plaintiff was trafficked there.

355.    In 2011, a Change.org petition was published to address rampant gang-based sex trafficking in Wyndham hotels in California. The petition argued that from 2006 to 2011, members of the Crips gang in San Diego ran child sex

trafficking rings of at least sixteen (16) girls out of various area hotels. Two subject properties on which many instances of child sex trafficking took place were a Howard Johnson in Escondido, California, and a Travelodge in San Diego, California, both owned by the Wyndham group.

356.    Days Inn Owners saw and heard sex trafficking occurring at the subject Days Inn from 2010 to 2016, including the trafficking of Plaintiff there. Days Inn Owners communicated with Plaintiff's traffickers and Wyndham Hotel & Resorts, Inc. about the trafficking of victims, including Plaintiff.  They sometimes referred to the victims as "hoes" or "sex workers" and the traffickers as "pimps." Days Inn Owners and their employees knew the traffickers and knew that the traffickers controlled Plaintiff and it was clear that Plaintiff's traffickers were watching Plaintiff at all times and forcing her to engage in commercial sex.  Days Inn Owners understood that Plaintiff was being forced to engage in commercial sex and that the money went directly to her traffickers for room rentals at the Days Inn and to the traffickers for profits, including Days Inn Owners' and Wyndham Hotel & Resorts, Inc.'s profits.

357.    Wyndham Hotel & Resorts, Inc. inspected the property regularly from 2010 to 2016 and saw the red flags of Plaintiff's and other victims' trafficking and knew or should have known that it was profiting and benefiting from the room rentals that directly resulted from the trafficking of Plaintiff and other sex trafficking victims at the subject Days Inn.

358.    Upon information and belief, before and at the time Plaintiff was trafficked at the subject Days Inn, Days Inn Owners and Wyndham Hotel & Resorts, Inc. saw victims, including but not limited to Plaintiff, being held captive, controlled, drugged, abused, hit and trafficked for sex there.  Days Inn Owners, Wyndham Hotel & Resorts, Inc., and/or their employees while working in the course

and scope of their employment with each, directly witnessed all signs of sex trafficking, including the signs of the trafficking of Plaintiff described above.

359.   The police responded to 911 calls from outsiders and guests at the subject Days Inn property regularly and approximately more than four hundred fifty (450) times from 2010 to 2016 for criminal activity, including crimes related to sex trafficking, prostitution, rape, domestic violence, sexual offenses, assault and battery, deaths, criminals with warrants, fights and serious bodily injuries requiring emergent medical attention.

360.   Days Inn Owners and Wyndham Hotel & Resorts, Inc. were made aware of those crimes and sex crime incidents in which law enforcement responded at the property during the subject times that Plaintiff was regularly trafficked there for sex, by and through law enforcement and the public, and did not do anything to try to prevent the sex crimes, including sex trafficking, from continuing to occur at the property from 2010 to 2016.

361.   Since at least the early 2000s, Days Inn Owners and Wyndham Hotel & Resorts, Inc. knew employees and staff at its properties, including the subject Days Inn, were participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their properties, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; not requiring identification cards or "IDs;" not requiring parking passes; not having gated parking lots; allowing daily payments of cash for extended stays; complying with requests for specific rooms; allowing traffickers to escort bruised and battered women to rooms without IDs; allowing several buyers to come in and out of the rooms without IDs where victims were trafficked; allowing guests to use illicit drugs on property; allowing violence to occur at the property; allowing guests to carry weapons on the property; ignoring yelling and screaming from rooms where trafficking took place;

ignoring obvious copious amounts of sex paraphernalia; not addressing the trafficking signs and reports of drugs, abuse and prostitution; forming relationships with traffickers and treating traffickers like "regulars" with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to any authorities or law enforcement or taking any steps to prevent or stop it from occurring at their property.

362.   Reviews for the subject Days Inn left on public online sites that were routed directly to Wyndham Hotel & Resorts, Inc. and Days Inn Owners show that guests reported "hookers" all around the property; "a sex worker was pounding on our door;" "hookers wandering around;" "this place is a drug den;" "the entire area seemed sketchy;" "DRUG DEALS AND PROSTITUTION HAPPENING AT THIS HOTEL;" "prostitutes & drug deals taking place at all hours;" "blood splatters and smears all over the walls, floors, toilet seat and bed spread;" "scary tweeked out people in the parking lot;" "drug deals being done;" "100% disgusting prostitutes proposition you at your car;" "loud fighting drug dealers just filthy everywhere;" "[t]here was active drug activity and prostitution occurring on the premise[s], which I reported to staff and the General Manager;" "I have already call Wyndham and filed a formal complaint, sharing the details of the unsanitary and unsafe conditions at the Days Inn Fresno;" had "also drug dealer;" "screaming women, (assumed) drug dealing next door to our room until 4 am and what I think was a prostitution ring going on in the parking lot… Even more concerning is the security guard walking around who though all this activity was completely normal and did nothing to stop it;"  "homeless, drug addicts, and tweeker ville;" "a bunch of police" came pounding on neighbor's door; "drug deals going on in the parking lot;" "a lot of people hanging out there like hookers and tweakers;" "shady clientele with possible parking lot drug deals;" "drugs left behind by previous guests;" "we saw a lot of homeless and drug addicts; "around midnight we saw and heard that someone tried to get into our

room;" "stayed in three different rooms and I found drug parafinalia [sic] in all three!;" "drug dealer selling in hotel parking."

363.    One review left on Google stated her little sixteen (16) year old cousin had went missing with an older man and that all motels in the area had been working with her except the subject Days Inn.  She said they would not help in any way and kept hanging up on her. The reviewer specifically stated: "*I wish I could report them in some way. This place is clearly a biohazard based on previous reviews/pictures.  **But on top of all that, IN MY OPINION, involved in potential sex trafficking**.*"

364.    Days Inn Owners and Wyndham Hotel & Resorts, Inc. have direct access to, read and respond to reviews left by guests on websites wherein guests frequently complain about the prevalence of sketchy people, prostitution, hookers, drugs and drug use and dealing, unhealthy conditions, unsafe conditions, blood in rooms and on property, criminals at property, and other signs of trafficking at the subject Days Inn.  Days Inn Owners and Wyndham Hotel & Resorts, Inc. read online reviews, so they saw the reviews that put them on notice or should have put them on notice of trafficking occurring at the subject Days Inn, including from 2010 to 2016.

365.    Days Inn Owners and Wyndham Hotel & Resorts, Inc. provided the means necessary for traffickers to traffic victims, including Plaintiff.

366.    At all relevant times, Days Inn Owners and Wyndham Hotel & Resorts, Inc. arranged with traffickers to have victims housed in specific areas and rooms to make it easier for traffickers to conduct their business.

367.    At all relevant times, Days Inn Owners and Wyndham Hotel & Resorts, Inc. allowed traffickers to use other people's identification or did not require any form of identification, knowing illegal activity that would occur, and

understanding that sometimes payment would not be made until after the forced commercial sex acts.

368.   Days Inn Owners and Wyndham Hotel & Resorts, Inc. often charged higher room rates to traffickers in exchange for permitting trafficking activities to be conducted at the subject Days Inn and accommodating late, cash payments.

369.   Days Inn Owners' employees, including its security guards, often participated and engaged in trafficking activities at the subject Days Inn.  Plaintiff observed that the security guards were "in on it"—they were involved in the trafficking and had agreements with the traffickers.

370.   Wyndham Hotel & Resorts, Inc. knew or should have known about the Days Inn Owners' employees and agents' participation and engagement in trafficking activities at the subject Days Inn because it was readily apparent upon any reasonable inspection from 2010 to 2016.

371.   The subject Days Inn had malnourished, underage and adult women under the control of traffickers/pimps who openly conducted their trafficking business in front of Days Inn employees and/or management and the traffickers rented numerous hotel rooms for the buyers to come and go night after night. Wyndham Hotel & Resorts, Inc. and Days Inn Owners would have easily seen this regular, open activity upon any reasonable inspection of the property and did see it.

372.   Based upon information and belief, the subject Days Inn has had other sex trafficking survivors speak out against it related to its owners, operators and franchisors allowing and participating in the open and blatant sex trafficking that took place at the subject Days Inn during the same years alleged herein.

373.   During the period Plaintiff was trafficked at the subject Days Inn, obvious signs existed and were visible to anyone paying attention that her traffickers were engaged in sex trafficking.

374.   Other women and girls were trafficked by other traffickers at the same Days Inn at the same time as Plaintiff and Days Inn Owners and Wyndham Hotel & Resorts, Inc. saw and heard the signs and should have saw and heard the signs of that sex trafficking too.

375.   Other women and girls were trafficked by Plaintiff's traffickers at the same Days Inn and at the same time as Plaintiff.  Days Inn Owners and Wyndham Hotel & Resorts, Inc. knew traffickers were controlling women and girls at the subject Days Inn and forcing the women and girls to have sex there but Days Inn Owners and Wyndham Hotel & Resorts, Inc. only cared about getting money for rooms and chose not to intervene, report or do anything to stop the known trafficking and other crimes occurring at the property.

376.   Defendant Wyndham Hotel & Resorts, Inc.'s and Days Inn Owners' agents and employees were physically at the subject Days Inn often from 2010 to 2016 while Plaintiff was being trafficked there.  Based upon information and belief, the subject defendants' employees and agents were aware of all operations and criminal activity because they had employees that were engaged in such activity and regular guests that lived at the property for long periods of time that were also engaged in the criminal activities daily and nightly. The Days Inn defendants, by and through their employees and agents, inspected the property, conducted audits and were running major and day-to-day operations of the subject Days Inn such that they knew about the sex trafficking firsthand and by and through their employees and agents.

377.   At all relevant times, Plaintiff's traffickers would get the rooms; did not appear to have to show any form of ID to the Days Inn,  Days Inn Owners or their employees; were allowed to pay in cash nightly and would linger around the hotel or in the parking lot throughout the nights while Plaintiff was forced to have sex with non-guest buyers at the subject Days Inn multiple times per day for weeks

at a time. This was all in plain sight of Days Inn Owners daily and nightly,
Wyndham Hotel & Resorts, Inc. during inspections, and to both by and through
their employees and agents.

378.   At the subject Days Inn, Plaintiff's traffickers could be seen leaving the
room when another male arrived and then returning as soon as that male left. This
would happen multiple times a day/night, every day that Plaintiff was trafficked
there for weeks at a time, for years. Employees and traffickers worked together to
encourage buyers to participate and make it easy for sellers and buyers to conduct
business on the property for profits.  Days Inn Owners and Wyndham Hotel &
Resorts, Inc. made an active choice not to call the police or notify law enforcement
about the trafficking that they knew was going on at the subject Days Inn for years,
including the trafficking of Plaintiff, so that they would continue to profit from the
sex trafficking ventures.

379.   Heavy foot traffic took place in and out of the rooms where Plaintiff
and other victims were being harbored at the subject Days Inn. This foot traffic
involved men who were not hotel guests and did not show identification to the hotel
or require parking passes to park. Several men came in and out of the subject hotel
rooms and on and off the property in a single day. These individuals entered the
room Plaintiff and other victims were in and left at unusual hours and were present
at the hotel or in the room for brief periods of time. Their comings and goings were
visible to hotel employees and the employees of Days Inn Owners and Wyndham
Hotel & Resorts, Inc. that were located at the front desk and around the property.
Some employees and guests appeared to live at the Days Inn and were always
around.  A reasonable hotel/motel company would have seen these regular "red flag"
interactions at their property in plain sight and Days Inn Owner Defendants should
have seen it themselves while at the property, as well as by and through their

employees and agents whom were at the property and also observed all of the signs of Plaintiff's trafficking.

380.   Days Inn Owners and Wyndham Hotel & Resorts, Inc. allowed, facilitated, and participated in the trafficking.  Days Inn Owners and Wyndham Hotel & Resorts, Inc. could easily see what was going on because it was happening constantly and in plain view of them and their employees and agents.

381.   Plaintiff would have been seen by Days Inn Owners' and Wyndham Hotel & Resorts, Inc.'s employees as she was forced to come and go from the hotel rooms battered, bruised, tired, drugged, and unhealthy. Other victims, including minor victims, of Plaintiff's traffickers would have been visible to the employees and agents too.

382.   There were obvious signs of Plaintiff's trafficking visible to Days Inn Owners and Wyndham Hotel & Resorts, Inc. that were consistent with trafficking, which included well known "red flags" for trafficking in a hotel, such as the men going in and out, exchanges of money, abuse, control, condoms, sex paraphernalia, lingerie, loitering, drug use and selling, and solicitation. These things were not only visible to but must have been seen by hotel employees surveilling, staying at the motel, inspecting the motel, watching camera footage, at the front desk, and entering and cleaning the rooms or even just collecting the trash.

383.   When forced and coerced into coming and going from the subject motel locations, Plaintiff looked unhealthy, unhappy, abused, scared and defeated. Her traffickers were always watching her, and her noticeable victim demeanor was visible to hotel employees that she passed by regularly at the subject Days Inn for years.

384.   Upon information and belief, multiple employees of each Defendant, including the Days Inn Owners and Wyndham Hotel & Resorts, Inc., and including management-level employees, observed, or were made aware of the obvious signs of

Plaintiff's trafficking while acting within the course and scope of their employment with each applicable defendant.

385.    Based upon information and belief, Days Inn Owners and Wyndham Hotel & Resorts, Inc. read all online reviews about the subject Days Inn property while each owned, had an ownership interest in, operated and/or controlled it. Numerous reviews were left online about the subject Days Inn that directly put defendants on notice of red flags of sex trafficking, including from 2010 to 2016.

386.    As such, Days Inn Owners and Wyndham Hotel & Resorts, Inc. knew and should have known that Plaintiff and others were being trafficked for sex at the subject Days Inn regularly from 2010 to 2016.

387.    At all times relevant, from 2010 to 2016, Days Inn Owners and Wyndham Hotel & Resorts, Inc. knowingly profited and directly benefited from the room rentals and other goods and things purchased as a direct result of their participation in the sex trafficking venture with Plaintiff's traffickers related to her trafficking and the trafficking of others.

**Wyndham Hotel & Resorts, Inc. Exercised Control Over the Subject Days Inn and the Days Inn Owners.**

388.    Days Inn Owners owned the Days Inn located at 2640 2nd Street in Fresno, California during the time Plaintiff was trafficked.

389.    Wyndham Hotel & Resorts, Inc. is vicariously liable for the acts, omissions, and knowledge of the Days Inn employees and staff of the subject Days Inn, including Days Inn Owners, because the employees and staff were Defendants' actual agents or subagents.

390.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendant Wyndham Hotel & Resorts, Inc., for parent companies to set exacting brand quality standards, rules and to retain control over day to day operations, including things like the temperature at which coffee shall be

served, room rates, documentation to be kept, how to handle crime, how to report crime, policies and procedures for staff to follow in response to suspected criminal activity, policies and procedures related to staff and employees engaging in criminal activity, employee and agent training, and to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

391.    Wyndham Hotel & Resorts, Inc. Defendant provides their Days Inn locations with signage on and in front of the buildings and throughout the properties. This is done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand, including the public statements and promises Wyndham Hotel & Resorts, Inc. makes to the public about safety and comfort. This brand logo is usually displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

392.    Wyndham Hotel & Resorts, Inc. provides their hotels branded locations brand name recognition, a marketing campaign, hotel listings, advertising, and participation in online hotel databases. They also provide access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand programs, training programs, audits, financial tools and company websites. Therefore, bookings and room reservations are primarily controlled by Wyndham Parent Hotel Defendants.[19]

393.    Wyndham Hotel & Resorts, Inc. subjects and at all relevant times subjected their hotel locations, including the subject Days Inn, to detailed standards and requirements regarding the operation of the subject Days Inn through agreements, detailed written policies and manuals and through other formal and

---

[19] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), The Origins and Growth of Franchising in the Hotel Industry (lodgingmagazine.com).

informal protocols, directives, mandates, reporting, and expectations imposed by the Wyndham Hotel & Resorts, Inc. parent hotel defendant.

394.    Upon information and belief, at all relevant times, Wyndham Hotel & Resorts, Inc. required its branded hotel properties, including the Days Inn Owners named herein, to use a property management system that is linked to the Wyndham Hotel & Resorts, Inc.'s corporate network and data center. This is to, among other things, receive reservations, process payment transactions, get data about guests, and get data about crime and other incidents of concern, including human trafficking.

395.    Upon information and belief, per the relevant agreements, Wyndham Hotel & Resorts, Inc. may enforce their brand standards and exercise their control through periodic, regular inspections of the hotel locations, including the subject Days Inn during the subject time period, backed up with the ultimate threat of and ability to terminate the agreement and operations.[20]

**Days Inn and Days Inn Owners Employees and Staff Acted as Actual Agents of Defendant Wyndham Hotel & Resorts, Inc.**

396.    Wyndham Hotel & Resorts, Inc. is vicariously liable for the acts, omissions, and knowledge of their employees, agents and staff of the subject Days Inn location described herein, which are Wyndham Hotel & Resorts, Inc.'s actual agents or subagents.

397.    Days Inn Owners and Wyndham Hotel & Resorts, Inc. subjected Days Inn employees and agents to detailed training, standards and requirements regarding the operation of the Days Inn location named herein through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations

---

[20] Many of the franchise disclosure documents, which outline the policies and procedures of franchise agreements can be accessed publicly on https://fddexchange.com/view-fdd-docs.

imposed by Wyndham Hotel & Resorts, Inc.—and the Corporation retained the right to enforce its training, policies, rules and standards.

398.    Upon information and belief, the standards that Defendant Wyndham Hotel & Resorts, Inc. imposed and imposes on their branded properties at all relevant times included but were not limited to the following:

      a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Days Inn Fresno used at its Fresno location;

      b.  Covered virtually all aspects of hotel operations, including internal operating functions;

      c.  Dictated the specific manner in which Days Inn Owners and the subject Days Inn and hotel staff must carry out most day-to-day functions at the Days Inn Fresno; and

      d.  Significantly exceeded what was necessary for Wyndham Hotel & Resorts, Inc. to protect its registered trademarks.

399.    In addition to the ways described above, upon information and belief, Wyndham Hotel & Resorts, Inc. exercised and reserved the right to exercise systemic and pervasive control over Days Inn Owners' and the subject Days Inn's day-to-day operation of the subject Days Inn location during relevant times, including in the following ways:

      a.  Defendant Wyndham Hotel & Resorts, Inc. required Days Inn Owners and management of the hotel to participate in training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham Hotel & Resorts, Inc. to protect its registered trademarks;

b. Defendant Wyndham Hotel & Resorts, Inc. provided training for hotel management and select hotel staff on-site at the Days Inn location and Wyndham Hotel & Resorts, Inc. went to the Days Inn location;

c. Wyndham Hotel & Resorts, Inc. required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. Wyndham Hotel & Resorts, Inc. controlled training provided by Days Inn Owners to hotel staff by dictating the content of that training, especially related to human trafficking, providing required content for that training, and dictating the training methods used;

e. Wyndham Hotel & Resorts, Inc. retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Days Inn Fresno was required to purchase to operate the Days Inn location, Wyndham Hotel & Resorts, Inc. designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor such that it had to sign off or give permission;

g. Wyndham Hotel & Resorts, Inc. required the Days Inn Owners to sign technology, software, and data agreements governing the terms under which it must procure, store, share and use technical services, software and data related to the subject Days Inn. Days Inn Owners were required to install, and use certain brands, types, make, and/or models of hardware, software, peripheral equipment, data storage, data sharing devices and software and support services to perform internal operating functions at the subject Days Inn;

h. Wyndham Hotel & Resorts, Inc. consistently communicated with, directed, instructed, and got updates from certain staff and employees of Days Inn Owners and any management companies of the subject Days Inn;

i. Wyndham Hotel & Resorts, Inc. established detailed job descriptions for several positions in its Days Inn properties, including the subject Days Inn, and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. Wyndham Hotel & Resorts, Inc. Defendant set requirements for the hiring process used by Days Inn Owners, property management companies, and oversaw employee discipline processes and termination decisions such that Wyndham Hotel & Resorts, Inc. wanted to and did retain control over employment issues between Days Inn Owners and their employees and agents that ran the day-to-day operations at the subject Days Inn;

k. Wyndham Hotel & Resorts, Inc. provided benefits and perks for employees of Days Inn Owners and anyone that worked for the subject Days Inn;

l. Wyndham Hotel & Resorts, Inc. required Days Inn Owners to use a customer resource management program maintained and operated by the Wyndham Hotel & Resorts, Inc.;

m. Wyndham Hotel & Resorts, Inc. controlled channels for guests to report complaints or provide feedback regarding the subject Days Inn location and directly participated in the response and/or supervised the response to customer complaints or other feedback. Wyndham Hotel & Resorts, Inc. retained the right to provide

refunds or other compensation to guests and to require Days Inn
Owners or other Days Inn employees to pay associated costs;

n.  Wyndham Hotel & Resorts, Inc. generated reports and analysis of
guest complaints and online reviews for the subject Days Inn
location;

o.  Wyndham Hotel & Resorts, Inc. required Days Inn Owners and the
subject Days Inn to use a Guest Relations Application/software
owned, operated, and maintained by Wyndham Hotel & Resorts,
Inc. to manage all guest data and information. Wyndham Hotel &
Resorts, Inc. could use the backend of this system to analyze data
and generate reports;

p.  Wyndham Hotel & Resorts, Inc. set detailed requirements for
insurance that their properties must purchase and retain the right
to purchase insurance for the locations and to bill the hotel owner
directly for that insurance if Wyndham Hotel & Resorts, Inc.
determines that the property has not purchased adequate
insurance;

q.  Wyndham Hotel & Resorts, Inc. regularly audited the books and
records of the subject Days Inn Location;

r.  Wyndham Hotel & Resorts, Inc. Defendant conducted frequent and
unscheduled inspections of Days Inn properties, including the
subject Days Inn location;

s.  Wyndham Hotel & Resorts, Inc. retained the right to issue fines,
require additional training, to impose and supervise
implementation of detailed corrective action plans, and to take
other steps up to and including termination of agreements if Days
Inn locations violated any of its detailed rules, expectations,

protocols, or policies, including those that governed day-to-day operations of the subject Days Inn;

t. Wyndham Hotel & Resorts, Inc. controlled all marketing for the subject Days Inn and prohibited it from maintaining any online presence unless specifically reviewed and approved by the Wyndham Hotel & Resorts, Inc., including but not limited to on all sites it was reviewed and reviewable;

u. Wyndham Hotel & Resorts, Inc. imposed detailed recordkeeping and reporting requirements on Days Inn Owners and the subject Days Inn regarding virtually all aspects of hotel operations;

v. Wyndham Hotel & Resorts, Inc. supervised and controlled day-to-day operations of the Days Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Days Inn Owners to use;

w. Wyndham Hotel & Resorts, Inc. retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the subject Days Inn.

x. Wyndham Hotel & Resorts, Inc. required that Days Inn Owners provide certain amenities in very specific ways and monitored the day-to-day offerings, including wi-fi, housekeeping, security, on-site parking, group rates, credit cards, online bookings, payment options that must be accepted, free breakfast, "best price guarantees," and booking and data technology; and

y. Wyndham Hotel & Resorts, Inc. flagged the subject Days Inn, which means it put the property under the umbrella of its company and told the public that it was part of a recognized brand and entered

into an agreement with the Days Inn Owners that mandated
Wyndham Hotel & Resorts, Inc. had control over the operations and
that it must operate under the brand's standards, rules and
guidelines.

## Wyndham Hotel & Resorts, Inc. Knowingly Benefited from Participation in a Venture with Days Inn Owners, the Subject Days Inn and Plaintiff's Traffickers.

400.    Wyndham Hotel & Resorts, Inc. and Days Inn Owners are inextricably intertwined.

401.    Upon information and belief, at all times of trafficking alleged herein and currently, the Days Inn locations typically pay a percentage of their total revenue back to the parent company, Wyndham Hotel & Resorts, Inc., and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

402.    Upon information and belief, per the franchise agreements, Wyndham Hotel & Resorts, Inc., could enforce standards through periodic, regular inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the corporation to enforce their brand standards, including safety standards, is not just their right but their responsibility.

403.    At all times of trafficking alleged herein, Wyndham Hotel & Resorts, Inc. dictated policies related to safety, security, human trafficking, employee training and the subject Days Inn Location's response to human trafficking and sex trafficking.

404.    Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject Days Inn passed through a system operated and managed by Wyndham Hotel & Resorts, Inc..

405.   Defendant Wyndham Hotel & Resorts, Inc. profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring at the subject Days Inn before and at that time, and specifically that she was being trafficked.

406.   Defendant Wyndham Hotel & Resorts, Inc. benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

407.   Defendant Wyndham Hotel & Resorts, Inc. profited from each and every room that Plaintiff's traffickers rented where Plaintiff was harbored, abused, drugged and maintained for the purpose of sex trafficking.

408.   Defendant Wyndham Hotel & Resorts, Inc. facilitated the trafficking through its practices, policies, operations and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

409.   Days Inn Owners owned and operated the subject Days Inn while sellers reigned over the property and buyers paraded in and out of rooms rented for the purpose of trafficking Plaintiff. Their employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff. Their employees and agents observed or should have observed the trafficking occurring regularly and for weeks at a time, for years, at the subject Days Inn location but ignored it so they could profit.

410.   Plaintiff's trafficking at the subject Days Inn location was a result of Wyndham Hotel & Resorts, Inc. and the Days Inn Owners participating in a venture with each other and Plaintiff's criminal traffickers. If Wyndham Hotel & Resorts, Inc. had not continued participating in a venture that they knew or should

have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Plaintiff's trafficking at the subject hotel location.

411.    Despite its actual and/or constructive knowledge that the venture it was engaged in was in violation of 18 U.S.C. §§1591(a) and 1595(a) through the conduct of hotel staff and the widespread trafficking at the subject Days Inn, Defendant Wyndham Hotel & Resorts, Inc. participated in the venture by continuing to associate with the hotel staff and with each other to operate the hotel location named herein in a way that it knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including trafficking of Plaintiff and victims like Plaintiff.

412.    Defendant Wyndham Hotel & Resorts, Inc. financially benefitted from renting hotel rooms to Plaintiff and her traffickers on numerous occasions.

413.    Defendant Wyndham Hotel & Resorts, Inc. participated in this venture through the conduct described herein as they were jointly responsible for and/or had control over the specific hotel operations at the subject Days Inn location.

**Defendants Facilitated the Trafficking of Plaintiff**

414.    Upon information and belief, during the times Plaintiff was trafficked at the subject properties, Defendants participated directly in aspects of the operation of the subject properties for which they owned, had an ownership interested in, franchised and/or controlled that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff as follows:

      a.  Defendants assumed responsibility and control over the human trafficking response of their subject motel property, including design and implementation of practices to prevent trafficking, safety, and security procedures, employee, and franchisee

education, training and response, partnership with external
organizations, and advocacy;

b. Defendants retained control over when its branded hotel would
share information with law enforcement and when law enforcement
would be contacted about suspected criminal activity in their
branded hotel location;

c. Defendants retained control over determining which hotels needed
additional training or other resources on the risk of trafficking
occurring and other related criminal activity;

d. Defendants retained control to terminate hotel staff and/or
agreements based on the response to human trafficking;

e. Defendants determined whether the training is provided, when it is
provided, the content of the training, how the training is delivered,
who receives it, and the consequences of someone not participating
or failing to follow such training; and

f. Defendants retained control over setting, supervision, overseeing,
and enforcement policies and procedures for housekeeping services
at the subject motel location, including how often rooms must be
entered, how to respond to guest refusals of entry into rooms, and
steps to monitor guest safety issues through housekeeping services.

415.    As a direct and proximate result of these egregious practices of
Defendants, and each of them, Plaintiff and victims of sex trafficking and
exploitation have been permanently injured and damaged physically, emotionally,
psychologically, and financially.

416.    Defendants had both actual and constructive knowledge of the
trafficking of Plaintiff at the hotel locations they owned and operated because the

trafficking was the direct result of Defendants facilitating the trafficking at the subject locations.

417.    Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject hotel locations when operating the hotel because these acts and omissions were committed in the course and scope of employment. Defendants ratified these acts and omissions because Defendants failed to exercise reasonable care in the hiring, training, and supervision of these employees given the specific risks known and reported to Defendants of sex trafficking occurring that the subject hotel locations.

418.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject locations, Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

419.    Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them with a venue in the form of hotel rooms and related services, to harbor and facilitate Plaintiff's sexual exploitation.

420.    Defendants also facilitated widespread trafficking at their hotel locations, including the trafficking of Plaintiff in ways including:

      a.  Allowing inappropriate and inadequate practices for hiring, training, supervising, managing and disciplining front line staff regarding issues related to human trafficking;

      b.  Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

      c.  Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, laws, and/or applicable franchisor policies and procedures; and

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**Defendants are Jointly and Severally Liable for Plaintiff's Damages**

421. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

422. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION AGAINST DEFENDANTS
### Sex Trafficking under 18 U.S.C. § 1595
### 1. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Against All Defendants)

423. Plaintiff realleges and incorporates the allegations in paragraphs 1 through 421.

424. Plaintiff is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

425. Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals, including Plaintiff, knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

426.    Violations of 18 U.S.C §1595(a) by each of the Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages as a direct and proximate result of being trafficked and sexually exploited at the Defendants' hotel properties.

## 2. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

427.    Plaintiff realleges and incorporates the allegations in Paragraphs 1 through 421 and 424 through 427.

428.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

429.    Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. As more specifically alleged above, Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted.

Defendants' employees had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the traffickers and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

430.    Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of their respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

431.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**3.  Cause of Action: Vicarious Liability for TVPRA Violations (Vagabond Inn Corporation, Wyndham Hotel & Resorts, Inc., and Red Roof Inns, Inc.).**

432.    Plaintiff realleged and incorporates the allegations in Paragraphs 1 through 421 and 424 through 432.

433.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

434.    Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

435.     Vagabond Inn Defendants acted as the actual agents of Vagabond Inn Corporation when operating their respective subject Vagabond Inn hotel property and in committing the wrongful acts and inactions alleged herein.

436.     Days Inn Owners Defendants acted as the actual agents of Wyndham Hotel & Resorts, Inc. when operating their respective subject Days Inn hotel property and in committing the wrongful acts and inactions alleged herein.

437.     Red Roof Inn Defendant Oceanic Fresno, L.P. acted as the actual agents of Red Roof Inns, Inc. when operating their respective subject Red Roof Inn hotel property and in committing the wrongful acts and inactions alleged herein.

438.     Through the wrongful acts and omissions described throughout this Complaint, Vagabond Inn Corporation exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees, Vagabond Inn Defendants, to operate their respective subject Vagabond hotel property.

439.     Through the wrongful acts and omissions described throughout this Complaint, Wyndham Hotel & Resorts, Inc. exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees, Days Inn Owners, to operate their respective subject Days Inn hotel property.

440.     Through the wrongful acts and omissions described throughout this Complaint, Red Roof Inn, Inc., exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee, Oceanic Fresno, L.P., to operate their respective subject Red Roof Inn hotel property.

441.     Vagabond Inn Corporation Defendant is vicariously liable for the TVPRA violations of their franchisees, the Vagabond Inn Defendants, and the subagents of such franchisees.

113

442.    Wyndham Hotel & Resorts, Inc. is vicariously liable for the TVPRA violations of their franchisees, the Days Inn Owners Defendants, and the subagents of such franchisees.

443.    Red Roof Inns, Inc. is vicariously liable for the TVPRA violations of their franchisees, Oceanic Fresno, L.P., and the subagents of such franchisees.

445.    Additionally, on information and belief, each of the parent hotel corporation Defendants, Vagabond Inn Corporation, Wyndham Hotel & Resorts, Inc., and Red Roof Inns, Inc., participated in a joint venture operating each of the respective and applicable subject locations: the subject Vagabond Inn, Days Inn, and Red Roof Inn. They each had highly integrated operations at the hotels, shared revenue and profits generated from the hotels and exercised mutual control over the sex trafficking venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

## JOINT AND SEVERAL LIABILITY

446.    Plaintiff reallege and incorporates the allegations in Paragraphs 1 through 421 and 424 through 445.

447.    "Joint and several liability 'applies when there has been a judgment against multiple defendants."[21] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[22]

448.    Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a

---

[21] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).
[22] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[23]

449.    Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of her injuries and damages alleged herein.

## DAMAGES

450.    Defendants' wrongful acts and omissions described above, individually and collectively, caused Plaintiff to sustain legal damages.

451.    Plaintiff did suffer the following injuries as a direct and proximate result of Defendants, and each of their, wrongful actions and inactions alleged herein, and as such Plaintiff is entitled to be compensated for past and future personal injuries, non-economic damages, and economic damages, see, e.g., 18 U.S.C. §§ 1593, 1595, including:

   a.  actual damages;

   b.  direct damages;

   c.  incidental and consequential damages;

   d.  lost earnings and lost earning capacity;

   e.  necessary medical expenses;

   f.  life care expenses;

   g.  physical pain and suffering;

   h.  physical impairment;

   i.  mental anguish and emotional distress damages (until trial and in the future);

   j.  restitution;

   k.  unjust enrichment; and

---

[23] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

l.   disgorgement of profits.

452.    Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

## PUNITIVE DAMAGES

453.    Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. See *Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## ATTORNEY FEES

454.    Plaintiff is entitled to recover her costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. See 18 U.S.C. § 1595(a).

455.    All conditions precedent to Plaintiff's recovery of its costs and attorney's fees have occurred or will occur prior to entry of judgment in this suit.

## JURY DEMAND

456.    Plaintiff requests a jury trial in this action.

## PRAYER

457.    For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a.   all economic damages to which she is entitled;

b.   all actual damages to which she is entitled;

c.   all incidental and consequential damages to which she is entitled;

d.   all mental anguish and emotional distress damages to which she is entitled;

e.   all restitution damages to which she is entitled;

f.  all disgorgement of profits to which she is entitled;

g.  all unjust enrichment damages to which she is entitled;

h.  exemplary, treble, and/or punitive damages;

i.  attorneys' fees and costs of suit;

j.  pre-judgment and post-judgment interest at the highest rate allowed by law; and

k.  all other relief to which she is or may be entitled in law or in equity.

SINGLETON SCHREIBER, LLP

Dated: January 2, 2025          By:   /s/Meagan L.Verschueren
                                      Brett Schreiber (CA 239707)
                                      Meagan Verschueren (CA 313117)
                                      Katie Llamas (CA 303983)
                                      Attorneys for Plaintiff